# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD C. FREDERICK, et al., and all other persons similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 08-288 Erie District Judge McLaughlin |
| RANGE RESOURCES - APPALACHIA, LLC, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Presently pending before the Court is a Motion for Final Approval of Settlement [Doc. 63] and a Joint Supplemental Motion for Final Certification of Class and Approval of Settlement [Doc. 80] between the Plaintiff class and Defendant, Range Resources-Appalachia, LLC ("Range Resources"). Also before the Court is a Motion for Attorney Fees and Plaintiff Reimbursements filed by Plaintiffs. [Doc. 68]. For the reasons which follow, the Court will approve the proposed Settlement and grant Class Counsel's request for attorney fees.

## I. BACKGROUND

Plaintiffs are the owners of royalty interests in natural gas produced and sold by Range Resources. In their initial Complaint, Plaintiffs asserted claims for violation of the

Pennsylvania Guaranteed Minimum Royalty Act ("GMRA")(Count I)[1], Breach of Oil and Gas Leases (Count II), Conversion (Count III), and Unjust Enrichment (Count IV). Plaintiffs also requested injunctive relief and a declaration that the natural gas leases which provide for their royalty interests be "automatically terminated" as a result of the asserted violations. Plaintiffs' primary contention was that the GMRA precluded Range Resources from deducting the costs of transporting, processing, and marketing natural gas (collectively referred to as "post-production costs") after it is captured from the gas well. Plaintiffs contended that by so doing, their royalty payments fell below the statutory minimum of 1/8 provided for in the GMRA.

During the pendency of a motion to dismiss filed by Range Resources, the Pennsylvania Supreme Court issued a decision in Kilmer v. Elexco, 990 A.2d 1147 (Pa. 2010), wherein the Court held that deducting post-production costs from the gross sale proceeds before calculating the royalty *did not* violate the GMRA. Id. In the wake of Kilmer, Plaintiffs withdrew their challenge to the *legality* of the post-production cost deductions and filed an Amended Complaint challenging the propriety of the *amounts* deducted by Range Resources and seeking a court-ordered accounting. Specifically, Plaintiffs asserted that the Range Resources had improperly reduced the amounts of their royalty payments by: a) improperly using the point of sale volume of gas, rather than the volume of gas collected at the well head, to calculate the gross royalty; b) improperly adjusting the volumes by applying temperature and pressure; c) improperly assessing and deducting the costs of marketing the gas; d) assessing and withholding a management fee; and e) failing to pay royalties on the value of the sale of liquid hydrocarbons, a product extracted from the gas and sold separately by Range Resources. (Amended Complaint, ¶ 10).

---

[1]     The GMRA provides that a lease to remove oil or natural gas is not valid unless it guarantees the lessor "at least one-eighth royalty of all oil, natural gas or gas of other designations removed or recovered from the subject real property." 58 P.S. § 33.

Range Resources denied each of the allegations set forth above and raised several potential defenses including the general assertion that none of the alleged deductions were improper under Kilmer. (See Amended Answer).

Thereafter, the Court was informed by the parties that a tentative settlement had been reached. Pursuant to the proposed Settlement Agreement, Plaintiffs filed an Omnibus Motion seeking: 1) an order certifying the settlement class for settlement purposes; 2) preliminary approval of the proposed class Settlement Agreement; 3) appointment of class counsel; 4) authorization to disseminate class notice; and 5) a date for a formal hearing on the proposed settlement. Defendants filed a responsive brief wherein they urged the Court to grant Plaintiffs' motion and preliminarily approve the settlement. In brief, the proposed Settlement Agreement provides for an initial payment of $1,750,000, representing a refund of approximately 14% of the past charges contested in this litigation. It also purports to amend each of the leases between the class members and Range Resources by imposing reasonable caps on future post-production deductions at an agreed upon amount so as to avoid future litigation. The parties estimate the value of this portion of the Settlement at approximately $20,343,648. (See Settlement Agreement, Exhibit B, Projected Class Savings). Finally, the Settlement Agreement includes a payment of attorney fees from the common fund consisting of 25% of the initial payment and future payments at the rate of one-half ($0.005) cent per MCF of gas produced over the 60 months following court approval of the settlement.

On October 13, 2010, the Omnibus Motion was granted and the following class was preliminarily certified:

> a) **Class Membership**. The membership of the Class shall consist of Persons who held a Royalty Interest in any Pennsylvania and/or Ohio oil and/or gas estate at any time after September 15, 2004 that was, is or became Owned by Range, its predecessors or affiliates at any time prior to [the date of this Order].

b) **Exclusions**. Notwithstanding the foregoing, there shall be excluded from the Class,

    i)        Royalty Interest, to the extent included in the settlement of the class claims certified in the matter Charton v. MB Operating Co., Inc., Case No. 90-CV-110417 (Court of Common Pleas, Tuscarawas County, Ohio);

    ii)       A Royalty Interest, to the extent arising under an instrument which expressly prohibits the deduction of Post Production Costs.

    iii)      Any Person electing to be excluded from the Class;

    iv)      A Royalty Interest in any Ohio oil or gas estate, which estate became Owned by Range on or after April 1, 2010; and

    v)       A Royalty Interest in an Ohio oil or gas estate, which estate is among the undeveloped deep rights Owned by Range in Belmont, Columbiana and Jefferson County, Ohio that were retained by Range following the sale of Range's remaining Ohio oil and gas properties to an unrelated party on March 30, 2010.

See Omnibus Motion, Ex. 1. In so doing, I concluded that the Rule 23(a) elements of numerosity, commonality, typicality and adequacy of representation had all been satisfied and that Plaintiffs had further demonstrated the Rule 23(b)(3) elements of predominance and superiority. (See Memorandum Opinion and Order, 10/13/2010, Doc. 59). I also provisionally approved the Settlement Agreement and directed Class Counsel to provide notice of the proposed settlement to prospective class members in the fashion specified in the Omnibus Motion. As of December 10, 2010, notice had been mailed to all known members of the class, totaling 25,502 persons. As discussed more fully below, no member of the prospective class objected to the proposed Settlement, and only 59 prospective class members opted out. (Fairness Hearing, Transcript, p. 42).

A Fairness Hearing ("Hearing") on the proposed Settlement was held on January 10, 2011. In addition to presentations from counsel on issues germane to the fairness of the

proposed settlement, expert testimony was also presented.   Allen C. Barron, President of Ralph E. Davis Associates, Inc., an independent consulting firm, testified as to the opinions set forth in his expert report wherein he concluded that the monetary value attributed to the post-production costs was reasonable and consistent with industry standards.  In addition, he opined that the projected future savings to the class, based upon Range Resources' projections as to future drilling, appeared reasonable.  Dr. Harvey S. Rosen, an economist, testified as to the present value of the projected royalty savings to the class as well as the attorney fee payments contemplated by the Settlement Agreement.

Class Counsel explained at the Hearing that the parties had determined that the total amount of post-production costs deducted from royalty payments stemming from leases controlled by the class members during the relevant time period was $12,544,892. (Settlement Agreement, Exhibit A; Transcript, Fairness Hearing, p. 18).  Class Counsel further explained that the post-production costs had been broken into various categories including, for instance,  marketing fees, transportation, compression and dehydration costs, and third party pipeline gathering charges.  Class Counsel estimated that the "lion's share" of the overcharges involved the assessment of marketing fees and some of the third party pipeline gathering and transportation charges. (Transcript, Fairness Hearing, pp. 18-28). Based upon his review of the record, Class Counsel estimated that the best possible recovery that the class could expect to receive at trial as to the post-production cost claim was approximately 18% of $12,544,892, or $2,000,000.  (Transcript, Fairness Hearing, p. 28).

As to the cap on future post-production costs, Class Counsel explained at the Hearing that the proposed Settlement Agreement imposes, by way of an amendment to each of the leases, a cap on the amount of costs that can be deducted by Range Resources prior to calculation of royalties in the future. The parties estimate that this cap on deductions will provide an additional $20,343,648 in projected royalty savings to the class over the next five years.  (Settlement Agreement, Exhibit B, Projected Class Savings).

## II. APPROVAL OF THE PROPOSED CLASS
## SETTLEMENT AGREEMENT

Federal Rule of Civil Procedure 23(e) instructs that a class action may not be dismissed or compromised without the approval of the Court and notification to all class members. Fed. R. Civ. P. 23(e). This requires a district court to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." In re Cendant Corp. Litig., 264 F.3d 201, 231 (3rd Cir. 2001), *cert. denied sub nom*. Mark v. California Public Employees' Retirement Sys., 535 U.S. 929 (2002) (citation omitted). In so doing, the district court acts as a "fiduciary guarding the rights of absent class members" by ensuring that the proposed settlement is fair to all members of the class. Id.

A district court may only approve the settlement of a class action if the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In determining whether a proposed class action settlement is fair, reasonable and adequate, courts in this circuit have traditionally considered the criteria set forth in Girsh v. Jepson, 521 F.2d 153, 157 (3rd Cir.1975). These nine factors include: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation. Id.

The Girsh factors are not exhaustive, however, and the Third Circuit has advised that, "because of a 'sea-change in the nature of class actions' since Girsh was decided in 1975, district courts should also consider other potentially relevant and appropriate factors."

In re AT & T Corp., 455 F.3d 160, 165 (3rd Cir. 2006) (citing In re Prudential Ins. Co.

America Sales Practice Litigation Agent Actions, 148 F.3d 283, 323 (3rd Cir. 1998)).  These

may include, for example:

> [T]he maturity of the underlying substantive issues, as
> measured by the experience in adjudicating individual
> actions, the development of scientific knowledge, the extent
> of discovery on the merits, and other factors that bear on the
> ability to assess the probable outcome of a trial on the merits
> of liability and individual damages; the existence and
> probable outcome of claims by other classes and subclasses;
> the comparison between the results achieved by the
> settlement for individual class or subclass members and the
> results achieved-or likely to be achieved-for other claimants;
> whether class or subclass members are accorded the right to
> opt out of the settlement; whether any provisions for
> attorneys' fees are reasonable; and whether the procedure for
> processing individual claims under the settlement is fair and
> reasonable.

Id. (citations omitted).  The proponents of the settlement bear the burden of proving that

these factors weigh in favor of approving the settlement.  Erie County Retirees Ass'n v. The

County of Erie, 192 F.Supp.2d 369, 373 (W.D. Pa. 2002) (citing In re Cendant Corp. Litig.,

264 F.3d at 232).

     I now consider the relevant Girsh factors in light of the present record.


*1.     The Complexity, Expense and Likely Duration of the Litigation*

     The first Girsh factor requires consideration of "the probable cost, in both time and

money, of continued litigation" so as to determine the degree to which the class would

benefit from settling the class claims amicably.  Erie County Retirees Ass'n, 192 F.Supp.2d

at 373 (citing In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55

F.3d 768, 785 (3rd Cir. 1995)).

     I find that the continued litigation of this action through trial would entail a

significant expenditure of time and money.  The subject matter of this case is highly complex.

The process by which oil and gas is drilled, extracted, transported, and eventually sold is a

highly technical and sophisticated science. (Transcript, Fairness Hearing, pp. 29, 40-41). In addition, the documentary evidence in this case is voluminous and detailed. Both counsel contend, and I agree, that presenting this case to a jury unfamiliar with the complexities of the oil and gas industry would, at a minimum, be an arduous and challenging process.

For the foregoing reasons, I conclude that this factor weighs heavily in favor of approval of the proposed settlement.

### 2. The Reaction of the Class to the Settlement

This factor "attempts to gauge whether members of the class support the settlement." In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 317 (3rd Cir. 1998). In assessing the reaction of the class, a court may consider the percentage of opt outs and the number and "vociferousness" of any objectors. Id.

The record reflects that notice was mailed to all 25,502 persons in the class and that only 59 persons, representing well less than one percent of the total, opted out of the class action. (Transcript, Fairness Hearing, p. 42). No objections have been filed. Although courts must be "cautious about inferring support from a small number of objectors to a sophisticated settlement," see G.M. Trucks, 55 F.3d at 812, in this instance, the complete lack of negative response from the class suggests that class members are overwhelmingly favorable towards the proposed Settlement. See In re Rent-Way Securities Litig., 305 F.Supp.2d 491, 501-02 (W.D. Pa. 2003) (holding that "the paucity of objectors suggests overwhelming class-wide support for the proposed Settlement"); Shlensky v. Dorsey, 574 F.2d 131, 148 (3rd Cir. 1975) (noting that "the overwhelming majority of [class members] have not objected to the settlement"). This factor, therefore, weighs in favor of settlement approval.

### 3. The Stage of the Proceedings and Amount of Discovery Completed

The third <u>Girsh</u> factor requires the Court to consider the degree to which the litigation has developed prior to the proposed settlement in order to determine whether "counsel had an adequate appreciation of the merits of the case before negotiating." <u>In re Cendant</u>, 264 F.3d at 235. Class Counsel began investigating the merits of this action over four years ago, in October, 2006, on behalf of several clients including the named Plaintiffs. Since that time, counsel has devoted approximately 2,000 hours to researching claims, drafting briefs and motions, consulting with clients, exploring settlement options with Range Resources, and evaluating "thousands of pages of discovery." (Transcript, Fairness Hearing, pp. 39-40; Supplemental Submissions in Support of Application for Attorney Fees, pp. 1-2; Supplemental Submissions, Ex. 1, Attorney Time Records). The record further reflects that Range Resources has provided voluminous discovery including past financial and production data relevant to the leases as well as sensitive information as to their future business plans. (Transcript, Fairness Hearing, pp. 60-61). In addition to the exchange and review of voluminous documentary evidence, the record reflects that counsel engaged over the course of two years in a lengthy and arms-length settlement negotiation. (<u>Id</u>. at 69; Brief in Support of Motion to Certify Class, Ex. B, Altomare Decl. ¶ 8).

In light of counsel's extensive and thorough investigation into the merits of this action, as discussed more fully above, I am confident that Class Counsel had an ample opportunity to acquire a thorough appreciation of the strengths and/or weaknesses of his case at the time that the Settlement Agreement was reached. As such, this factor weighs in favor of approval of the proposed settlement.

4. *The Risks of Establishing Liability*

5. *The Risks of Establishing Damages*

The fourth <u>Girsh</u> factor addresses the risk of establishing liability at trial by asking "what the potential rewards (or downside) of litigation might have been had class counsel

decided to litigate the claims rather than settle them." In re Cendant, 264 F.3d at 237. In considering this factor, the court must attempt to balance the likelihood of success at trial against the benefits of immediate settlement. In re Prudential, 148 F.3d at 319. Similarly, the fifth Girsh factor "attempts to measure the expected value of litigating the action rather than settling it" in order to assess the potential risks of establishing damages at a trial. In re Cendant, 264 F.3d at 238. The risk of establishing damages "involves many of the same risks" as that of establishing liability "because the former is contingent upon the latter.'" In re Rent-Way, 305 F.Supp.2d at 504 (citing Erie County Retirees Ass'n, 192 F.Supp.2d at 375). As such, I address these factors together. See In re Prudential, 148 F.3d at 319-320 (addressing the fourth and fifth Girsh factors together).

If this action were to proceed to trial, the jury's primary task would be to determine what portion of the costs deducted from Plaintiffs' royalty payments could reasonably be considered as "post-production costs." All parties agree that, in resolving this issue, the jury would be required to assess expert testimony. In addition to the inherent uncertainties as to which expert the jury would choose to credit, Class Counsel acknowledged, for example, that it might be difficult to convince a jury that the pipelines which transmit gas from the well head to the end of the well property were not "necessary" to get the gas to market. (Transcript, Fairness Hearing, p. 43). Counsel for Range Resources, David Hardymon, represented that this case would be "vigorously defended" through trial in the absence of a settlement. (Transcript, Fairness Hearing, pp. 64-66). As explained by Mr. Hardymon:

> I think the context in which I would present this case to the jury revolves around the question of value of the product that is being produced. Our focus at least would be on the idea that from the moment the gas is produced at the well head, to the moment it reaches its point of sale, there a re a myriad of post-production activities. They're all necessary to get the raw minerals from the well head to the point of sale. I think the point we would underscore, would be that every one of those steps, every one of those different kinds of post-production activity, adds a value to the product. And, hence, that is value that is inuring to the royalty owner, because they're getting on balance 12-and-a-half percent of what the company realizes on sale.

(Transcript, Fairness Hearing, pp. 62-63). Given the highly technical and complex nature of this case, I agree with Mr. Hardymon's assessment that there would be "substantial risks to both sides" if this case were to be tried. (Transcript, Fairness Hearing, p. 66). Consequently, I conclude that this factor favors approval of the settlement.

      6.       *The Risks of Maintaining the Class Action Through Trial*

The sixth <u>Girsh</u> factor requires the court to consider of the risks of maintaining the class action through trial. This factor weighs in favor of settlement where there is a risk that the class action device might become unmanageable at some point prior to trial, creating the possibility of decertification. <u>In re Prudential</u>, 148 F.3d at 321. Here, the risk of decertification is minimal because the claims of the class members are essentially identical. In any event, the Third Circuit has opined that this <u>Girsh</u> factor "may not be significant" in settlement-only class actions. <u>In re Prudential</u>, 148 F.3d at 321.

      7.       *The Ability of the Defendants to Withstand a Greater Judgment*

The seventh <u>Girsh</u> factor addresses "whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." <u>In re Cendant</u>, 264 F.3d at 240. It is not disputed that the Defendant has considerable resources and could withstand a judgment in excess of the agreed upon settlement amount relative to past post-production overcharges. (Brief in Support of Final Approval, p. 6). Given the multitude of other factors that clearly weigh in favor of settlement approval, I do not view this factor, standing alone, as particularly significant.

      8.       *The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Risks of Litigation*

The final consideration required by <u>Girsh</u> is "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." <u>In re Prudential</u>, 148 F.3d at 322. The touchstone of this inquiry is the "economic valuation of the proposed Settlement." <u>In re Rent-Way</u>, 305 F.Supp.2d at 508 (quoting <u>Erie County Retirees Ass'n</u>, 192 F.Supp.2d at 376). Thus, in assessing the reasonableness of a settlement seeking monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." <u>In re Prudential</u>, 148 F.3d at 322 (quoting <u>G.M. Trucks</u>, 55 F.3d at 806).

As discussed more thoroughly above, this factor weighs heavily in favor of the proposed settlement. At the Hearing, Class Counsel estimated that the best possible recovery with respect to the recoupment of past overcharges for post-production costs was approximately $2,000,000. Here, the proposed settlement of $1,750,000 for past post-production costs represents 87.5% of the likely best possible recovery of the Plaintiffs' damage claim. Moreover, and importantly, the settlement provides a significant benefit to the class going forward (i.e., a cap on future post-production costs) that could not have been obtained at trial. (Transcript, Fairness Hearing, pp. 58-59).

### 9.    *Other Factors for Consideration*

Among the other factors cited by the Third Circuit for potential consideration, several of them have no particular application here. For example, "the maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions," and "the development of scientific knowledge" are primarily applicable only to mass tort actions. <u>See</u> <u>Lan v. Ludrof</u>, 2008 WL 763763, *17 (W.D. Pa 2008) (citing <u>In re Prudential Ins. Co.</u>, 148 F.3d at 323). Similarly, it is unnecessary to consider "the existence and probable outcome of claims by other classes and subclasses" and "the comparison

between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants" because this case does not involve the certification of any subclasses.

Another pertinent factor is whether class members are accorded the right to opt out of the settlement. In re Prudential, 148 F.3d at 323. In this case, as discussed above, class members were provided with such an opportunity and very few elected to do so.

Finally, the Third Circuit has directed courts to consider as a relevant factor whether any provisions for attorneys' fees are reasonable. Id. For the reasons discussed below, I conclude that Class Counsel's application for attorneys fees is reasonable.

In light of all of the foregoing, I conclude that the terms of the proposed settlement are fair, adequate, and reasonable. Accordingly, the Settlement Agreement is approved.

### III. APPLICATION FOR ATTORNEY FEES

I next consider the application made by Class Counsel for an award of attorney fees. As previously discussed, the Settlement Agreement creates a common fund consisting of three components: an initial payment of cash in the amount of $1,750,000; a future class savings resulting from the capping of allowable post production cost deductions by Range Resources; and a contribution to attorney fees in future payments at the rate of one-half ($0.005) cents per MCF of gas produced by the gas leases comprising the settlement class for a period not to exceed 60 months from the date of this Order. At the Hearing, Dr. Rosen credibly testified as to the present value of each portion of the common fund as summarized in the chart below:

| Component | Total Value | Attorney Share | Class Share |
|---|---|---|---|
| Initial Payment | $1,750,000 | $437,500 | $1,312,500 |
| Future Class Savings | $16,636,732 | $0 | $16,636,732 |

| Fee Contribution | $4,212,882 | $4,212,882 | $0 |
|---|---|---|---|
| Totals | $22,599,614 | $4,650,382 | $17,949,232 |
| Percentage of Common Fund | 100.00% | 20.58% | 79.42% |

As noted above, Class Counsel is seeking by way of fees 25% of the initial payment of $1,750,000, an amount totaling $437,500. In addition, assuming the accuracy of Range Resources' prediction as to the amount of its drilling activity over the next 60 months, Class Counsel estimates future attorney fees in the amount of $4,212,881 calculated at the rate of one-half cent per MCF of gas produced by the leases. As reflected in Dr. Rosen's testimony and in his report, the total present value of the fee sought is $4,650,382, representing 20.58% of the total estimated present value of the common fund. (Rosen Report, Application for Attorney Fees, Ex. A).

The Third Circuit has consistently ruled that the "percentage-of-recovery" method, rather than the "lodestar/multiplier" method, is the preferred approach for determining attorney fee awards in common fund cases, subject to a "lodestar/ multiplier" cross-check. See G.M. Trucks, 55 F.3d at 821; In re Rite Aid Corp. Securities Litig., 396 F.3d 294, 300 (3rd Cir. 2005); In re Cendant, 264 F.3d at 256; Rent-Way, 305 F.Supp.2d at 512-13, 516-17; Erie County Retirees Ass'n, 192 F.Supp.2d at 377-78.[2]

In determining an appropriate attorney fee award under the percentage-of-recovery approach, we are guided by the following considerations: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by

---

[2] As noted in this Court's opinion in Lan, the Third Circuit has twice convened a task force to consider the methods for determining attorneys' fees in common fund cases. See Lan, 2008 WL 763763 at *18 n. 6 (citing Report of the Third Circuit Task Force, 108 F.R.D. 127 (3rd Cir.1985) ( "1985 Task Force Report") and 2001 Task Force Report; Selection of Class Counsel ("2001 Task Force Report")). Both reports recommend the percentage of recovery approach. Id.

members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. In re Rite Aid, 396 F.3d at 301 (citing Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n. 1 (3rd Cir.2000)). The Third Circuit has advised that it may also be relevant to consider such factors as: the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and any "innovative" terms of settlement. See In re AT & T Corp., 455 F.3d 160, 165 (3rd Cir. 2006); In re Prudential, 148 F.3d at 338-40. These factors should not be applied in a "formulaic way" because each case is unique, "and in certain cases, one factor may outweigh the rest." In re AT & T Corp., 455 F.3d at 166 (citations omitted).

> 1.      *The Size of the Fund Created and Number of Persons Benefitted*

While there is no consensus as to the method for determining a reasonable percentage of attorney fees under the "percentage-of-recovery" approach, "several courts in this circuit have observed that fee awards under [that] approach typically range from 19% to 45% of the settlement fund, with 25% being the median award." Lazy Oil Co. v. Witco Corp., 95 F.Supp.2d 290, 341 (W.D. Pa.1997); Seidman v. American Mobile Sys., 965 F.Supp. 612, 622 (E.D.Pa.1997) ("Although no general rule exists as to what is a reasonable percentage, courts have found that an award of 25% of the common fund is ordinarily reasonable."); Hanrahan v. Britt, 174 F.R.D. 356, 368 (E.D. Pa.1997) (noting that median award of counsel fees in a class action is approximately 25%); Lachance v. Harrington, 965 F.Supp. 630, 648-49 (E.D.Pa.1997); In re Rite Aid, 396 F.3d at 303 (citing, *inter alia*, one study by the Federal Judicial Center in which it was found that the median percentage

recovery range with respect to all class actions resolved or settled over a 4-year period was 27-30%); First State Orthopaedics v. Concentra, Inc., 534 F.Supp.2d 500 (E.D. Pa. 2007) ("Many courts have considered 25% to be the benchmark figure for attorney fee awards in class action lawsuits, with adjustments up or down for case-specific factors ..."). The procedure for arriving at a fee award "will involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage will decrease as the size of the fund increases." Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 256 (1985) (quoted in In re Cendant, 243 F.3d at 736). This sliding scale is intended to account for cases where the sheer size of the common fund might create an attorney fee that would "ha[ve] no direct relationship to the efforts of counsel." In re Prudential, 148 F.3d at 339.

As noted above, the attorney fee sought in this case represents approximately 20.58% of the common fund, a percentage which is commensurate with the range commonly approved in cases involving comparable settlement funds. See, e.g., In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231 (D. Del.2002) (in class action involving $44.5 million settlement fund, attorneys' fees amounting to 22.5% of the fund were reasonable); In re Rite Aid, 146 F.Supp.2d at 735 (citing affidavit of Professor John C. Coffee, Jr. of Columbia University Law School, in which 289 class action settlements are compiled ranging from under $1 million to $50 million; average attorney's fees percentage is 31.71% and median is one-third); In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 486 (S.D.N.Y.1998) (finding that awards in class action settlements up to $50 million typically range from 20-30% with a benchmark of 25%) (citing cases); In re Medical X-Ray Film Antitrust Litig., 1998 WL 661515 (E.D.N.Y. 1998) (awarding fees that comprised 33.33% of the $39.36 million settlement); Lazy Oil, 95 F.Supp.2d at 342-43 (W.D. Pa.1997) (noting a range of 20-27% fee awards in cases that settled for $20-30 million, and awarding attorneys' fees in the amount of 28% of the $18.9 million settlement fund). While the

estimated size of the common fund (approximately $22,000,000) is certainly substantial, it is not a "mega-fund" that would dictate an award at the low end of the sliding scale.[3]

Based on the above, I find that this factor supports reasonableness of the attorney fee application.

### 2. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel

The Notice of Proposed Settlement issued by the parties advised prospective class members that Class Counsel would apply for the fee award described herein and that any class member could object to either the Settlement or the fee application. There have been no objections by class members to either the proposed settlement or the fee application. The absence of objections supports the reasonableness of the fee request. See In re Rent-Way, 305 F.supp.2d at 514-15 ("[W]e view the reaction of the Class as a factor also supporting approval of Lead Counsels' fee petition."); Gunter, 223 F.3d at 199 ("[A] client's views regarding her attorneys' performance and their request for fees should be considered when determining a fee award.").

### 3. The Skill and Efficiency of the Attorneys Involved

As noted in this Court's previous order appointing class counsel, Class Counsel has litigated issues related to oil and gas development and exploration for over 35 years, including at least one class action suit in this Court. (See Declaration of Joseph E. Altomare, Omnibus Motion, Ex. B). In the instant case, counsel has spent over two years investigating potential claims, participating in extensive discovery, and, ultimately, pursuing lengthy

---

[3]  "Courts and legal commentators seem to define 'mega funds' as those consisting of at least $50 to $100 million." In re Rent-Way, 305 F.Supp.2d at 514 n. 5 (citing authorities).

settlement negotiations. Counsel's briefing and arguments throughout this litigation have demonstrated a firm understanding of applicable law, and a review of counsel's time sheets reveals that this litigation has been conducted in an efficient and professional manner. (Supplemental Submissions in Support of Application for Attorney Fees, Ex. 1, Attorney Time Sheets). At the Hearing, defense counsel specifically cited Class Counsel's experience in litigating oil and gas cases as a factor that significantly aided settlement efforts:

> I have been through a number of these cases involving royalty, accounting and royalty litigation. I will say that the difference between negotiating this kind of a settlement with a lawyer of Mr. Altomare's experience and caliber, and a very good lawyer, who simply hasn't had very much background in oil and gas matters, is night and day. So I can confirm that when Mr. Altomare says we engaged in a vigorous give and take over approximately two years, that it was focused, none of it was wasted effort.

(Transcript, Fairness Hearing, p. 60). Finally, "[t]he fact that not a single objection has been filed to the Settlement (and only a very small percentage of the affected shares have opted out of the Settlement) is strong evidence that counsel for the Class have achieved a very good result for the Class." Lan, 2008 WL 763763 at *23.

### 4. The Complexity and Duration of the Litigation

These factors were previously addressed in connection with granting approval of the Settlement, *supra*. I find that these factors support the reasonableness of the fee application.

### 5. The Risk of Nonpayment

This factor attempts to assess "the risk that counsel takes in prosecuting a client's case." See Gunter, 223 F.3d at 199. In this case, this factor weighs in favor of granting the requested fee award for several reasons.

When Class Counsel filed this action, the state of the law in Pennsylvania was unsettled as to whether companies such as Range Resources were legally entitled to deduct post-production costs prior to calculating royalties. When the Pennsylvania Supreme Court decided <u>Kilmer</u>, it squarely rejected Class Counsel's primary legal argument that the deduction of post-production costs was prohibited by the GMRA. This required Class Counsel to shift the focus of the case from the *legality* of any deduction of post-production costs to a more fact-intensive inquiry relative to the *reasonableness* of the post-production costs deducted. As discussed above, given the complexity of this case, a jury trial would have entailed substantial risks for both sides.

I also note that the structure of the fee award itself presents another risk of a substantial reduction in future attorney fees given the fact that those fees are tied directly to Range Resources' estimate of future gas production by the class members' wells over the next 60 months. In this regard, if Range Resources' projections fall short, it will result in a corresponding reduction in Class Counsel's fee. In addition, while the class will continue to enjoy the benefit of the future cap on post-production costs beyond the 60 month period, Class Counsel's future fee award will be limited to those 60 months. Dr. Rosen recognized this risk in his report:

> Whereas, the owners of the leases can expect royalties for as long as their wells are productive, legal fee payments are limited and will be based on actual well production of a 60 month period beginning January 2011.

(Application for Attorney Fees, Ex. A, Rosen Report). For the above reasons, this factor weighs in favor of the reasonableness of the requested fee award.

6.    *The Amount of Time Devoted to the Case by Class Counsel*

Class Counsel has represented, and his time sheets confirm, that he has devoted approximately 2,000 hours to this litigation to date. He further estimates that he will spend

approximately 1,225 hours over the next four years in responding to class member inquiries and other administrative matters related to the settlement. This represents a significant investment of time and resources, particularly considering that counsel is a sole practitioner.

7.     *The Awards in Similar Cases*

As previously discussed, the percentage of recovery here - 20.58% of the projected value of the common fund - is comfortably within the range that courts have awarded in cases with settlement funds of similar sizes. See, e.g., In re Vicuron Pharmaceuticals, Inc. Securities Litig., 2007 WL 1575003 (E.D. Pa. May 31, 2007) (approving counsel fees equal to 25% of the $12.75 million settlement); Lenahan v. Sears, Roebuck and Co., 2006 WL 2085282 (D.N.J. 2006) (fees award equaled 30% of $15 million fund), *aff'd*, 2008 WL 466471 (3rd Cir. 2008); In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231 ( fees award equaled 22.5% of $44.5 million settlement fund); In re Medical X-Ray Film Antitrust Litig., 1998 WL 661515 (awarding fees that comprised 33.33% of the $39.36 million settlement); Lazy Oil, 95 F.Supp.2d at 342-43 (W.D. Pa.1997) (awarding attorneys' fees in the amount of 28% of the $18.9 million settlement fund).

8.     *Other Relevant Factors*

Other relevant factors to consider include the degree to which the benefits accruing to class members are attributable to efforts of other groups, such as governmental agencies, rather than Class Counsel, whether the settlement contains any "innovative" terms of settlement, and the percentage fee that might have been negotiated had this case been subject to a private contingent fee agreement at the time counsel was retained. See In re AT&T Corp., 455 F.3d at 165; In re Prudential, 148 F.3d at 338-40. I find that each of these factors further supports the requested fee award. Here, governmental agencies or other bodies conducting investigations did not lay the groundwork for either the lawsuit or for the

settlement. Moreover, the contingency fee agreement that the named Plaintiffs and Class Counsel initially entered into at the outset of this litigation called for a contingency fee of 33.5%, an amount substantially higher than that sought here. (Application for Attorney Fees, Ex. B, Contingency Fee Agreement). Finally, the Settlement Agreement is "innovative" in that it provides the class with a tangible monetary benefit that could not have been achieved even if the class had been successful at trial (i.e., a cap on the amount of future post-production costs that are properly deductible).

In sum, I conclude that the Gunter factors favor approval of the fee award requested. However, the Third Circuit has advised that "'it is sensible for a court to use a second method [i.e., the lodestar/multiplier method] of fee approval to cross check' its initial fee calculation" under the percentage-of-recovery approach. Gunter, 223 F.3d at 195 n. 1. The lodestar multiplier "need not fall within any pre-defined range, provided that the District Court's analysis justifies the award. In re AT&T Corp., 455 F.3d at 172-73.

In addition to the approximately 2,000 hours already invested in the case to date, Class Counsel estimates that he will spend an additional 1,125 hours over the next four years in administrating the settlement and responding to queries and concerns from some of the 25,202 members of the class. Class Counsel further represents that his standard fee rate is $250 per hour. (Application for Attorney Fees, Ex. D, Altomare Declaration). Based on these estimates, the lodestar crosscheck results in a multiplier of 5.95, as represented below:

| Total Hours | 3,125 |
|---|---|
| Rate | $250 |
| Lodestar | $781,250 |
| Total Value of Fee Request | $4,650,382 |
| Multiplier | 5.95 |

(Application for Attorney Fees, pp. 7-8). It is impossible, however, to establish the appropriate multiplier in this case with absolute certainty. That is because it is based, in part,

on Class Counsel's estimate as to the number of future hours he will devote to addressing class members' issues over the next four years. Even if his estimate ultimately proves to be somewhat high, it is entirely reasonable to assume that a substantial number of additional hours will reasonably be incurred over the next several years. In addition, if the projections as to future gas production falls short, Class Counsel's fee, and therefore, the multiplier, will be reduced.

Federal courts in this circuit have frequently approved fee award multipliers in the range of 1 to 4. In re Prudential, 148 F.3d at 341; In re Rent-Way, 305 F.Supp.2d at 517 (collecting cases). Multipliers in excess of this range, while warranting enhanced scrutiny, are not completely unusual. In re Rite Aid Corp. Sec. Litig., 362 F.Supp.2d 587, 589-90 (E.D. Pa. 2005) (approving a fee award with a multiplier of 6.96); Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., 2005 WL 1213926, *18 (E.D. Pa. 2005) (awarding fees with a lodestar multiplier of 15.6); In re R.J.R. Nabisco Sec. Litig., MDL No. 818(MBM), 1992 U.S. Dist. LEXIS 12702, at *16 (S.D.N.Y. Aug. 24, 1992) (approving request for fees and expenses resulting in a lodestar multiplier of 6); Muchnick v. First Fed. Sav. & Loan Assoc., 1986 U.S. Dist. LEXIS 19798 (E.D. Pa. 1986) (approving fee request of $250,000 from a settlement fund of between $4 million and $6.8 million, resulting in a lodestar multiplier of 8); Cosgrove v. Sullivan, 759 F.Supp. 166 (S.D.N.Y.1991) (approving fee representing a lodestar multiplier of 8.75); Roberts v. Texaco, Inc., 979 F.Supp. 185, 198 (S.D.N.Y.1995) (approving attorney's fee award with a lodestar multiplier of 5.5). Here, the vagaries attendant to calculating the multiplier undermine its utility somewhat in this case. Nevertheless, I conclude that it offers some additional support for the reasonableness of the proposed settlement. I further note that, in any event, "[t]he lodestar cross-check . . . should not displace a district court's primary reliance on the percentage-of-recovery method." In re AT&T, 455 F.3d at 165; see also In re Rite Aid Corp. Sec. Litig., 396 F.3d

294, 307 (3rd Cir. 2005) (holding that "the lodestar cross-check does not trump the primary reliance on the percentage of common fund method.").

Consequently, I conclude that each of the foregoing factors support the reasonableness of the requested award. My conclusion in this regard is also buttressed by the innovative nature of the Settlement Agreement which ensures a monetary benefit to the class going forward in the nature of a cap on post-production costs. Although this benefit will inure to the class members for the duration of their leases, Class Counsel's future fee projection is entirely dependent upon the accuracy of Range Resources' estimate as to future gas production and, furthermore, does not extend beyond 60 months from the date of approval of the Settlement Agreement.

## IV. REIMBURSEMENT FOR PLAINTIFF EXPENSES

Class Counsel has applied for reimbursement of $10,000 in expenses from thec common fund to named Plaintiff Donald C. Frederick. This represents the amount that Frederick advanced to counsel for expenses incurred in investigating and prosecuting the class claims. Class Counsel does not seek reimbursement of any other expenses aside from the amount forwarded by Mr. Frederick.

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... reasonable litigation expenses from that fund." In re Rent-Way, 305 F.Supp.2d at 519; In re Corel Corp. Inc. Securities Litig., 293 F.Supp.2d 484, 498 (E.D. Pa 2003) (citation omitted). The requested expenses of $10,000 are adequately documented and are reasonable in relation to the amount of the settlement fund. Indeed, the requested amount is well below the expenses awarded by this Court in other class actions. See Rent-Way, 305 F.Supp.2d at 519 (awarding $283,907 in expenses); Lazy Oil, 95 F.Supp.2d at 324 (awarding $486,165 in expenses); Lan, 2008 WL 763763 at *18

(awarding $66,080.81 in expenses). As such, Class Counsel's application for an expenses award of $10,000 is approved.

## V. CONCLUSION

For the foregoing reasons, I hereby approve the proposed Settlement Agreement as fair, reasonable and adequate to the class members. As such, the motion for final approval of the settlement [Doc. 63] is GRANTED. Plaintiffs' Application for Attorney Fees and Plaintiff Reimbursements [Doc. 68] is also GRANTED. Finally, the parties Joint Supplemental Motion for Final Certification of Class [Doc. 80] is GRANTED. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


DONALD C. FREDERICK, et al., and all ) 
other persons similarly situated, ) 
                             ) 
                             ) 
               Plaintiffs, ) 
        v. )    C.A. No. 08-288 Erie 
                             )    District Judge McLaughlin 
RANGE RESOURCES - APPALACHIA, LLC, ) 
                             ) 
            Defendant. ) 
                             ) 
                             )

## <u>ORDER</u>

AND NOW, this 17th day of March, 2011, and for the reasons set forth in the accompanying

Memorandum Opinion, IT IS HEREBY ORDERED THAT:


    1.     Class Counsel's Motion for Final Approval of Settlement [Doc. 63] and the parties' Joint Motion for Certification of Class and Approval of Settlement [Doc. 80] are GRANTED.


    2.     The Plaintiff Class is defined as follows:

        a) **Class Membership**.  The membership of the Class shall consist of Persons who held a Royalty Interest in any Pennsylvania and/or Ohio oil and/or gas estate at any time after September 15, 2004 that was, is or became Owned by Range, its predecessors or affiliates at any time prior to [the date of this Order].

        b) <u>Exclusions</u>.  Notwithstanding the foregoing, there shall be excluded from the Class,

                i)     Royalty Interest, to the extent included in the settlement of the class claims certified in the matter Charton v. MB Operating Co., Inc., Case No. 90-CV-110417 (Court of Common Pleas, Tuscarawas County, Ohio);

      ii)     A Royalty Interest, to the extent arising under an instrument which expressly prohibits the deduction of Post Production Costs.

      iii)    Any Person electing to be excluded from the Class;

      iv)    A Royalty Interest in any Ohio oil or gas estate, which estate became Owned by Range on or after April 1, 2010; and

      v)     A Royalty Interest in an Ohio oil or gas estate, which estate is among the undeveloped deep rights Owned by Range in Belmont, Columbiana and Jefferson County, Ohio that were retained by Range following the sale of Range's remaining Ohio oil and gas properties to an unrelated party on March 30, 2010.

      vi)    Any person who was not listed on Exhibit B to the Affidavit of Mailing Supplemental Notice [Doc. 75].

c) **Defined Terms**: "Owned by Range" means oil and gas interests owned, leased or operated by Range, excluding those wells of which Range is a non-operator and/or is not vested with the right or obligation to calculate and pay the royalty. All other undefined capitalized terms used in the foregoing shall have the special meaning ascribed to them in the Agreement and Stipulation of Settlement.

3.     The terms of settlement set forth in the Second Amended Agreement and Stipulation of Settlement [Doc. 73-1] are approved.

4.     In furtherance of the Settlement Agreement, a separate Order Amending Leases shall be issued contemporaneous with this Order, the terms of which are incorporated herein by reference.

5.     Class Counsel's Motion for Attorney Fees and Plaintiff Reimbursements [Doc. 68] is GRANTED.

6.     This matter is closed.


It is so ORDERED.


                          /s/ Sean J. McLaughlin
                          United States District Judge

cm: All parties of record. ___