# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONALD C. FREDERICK and )
LOUISE M. FREDERICK, h/w, )
MICHAEL A. MAHLE and )
PAULA M. MAHLE, h/w, DONALD )     Civil Action No. 1:08-cv-288-SPB
PORTA, and all other persons similarly )
situated, )
)
             Plaintiffs, )
)
        v. )
)
RANGE RESOURCES - )
APPALACHIA, LLC, )
)
          Defendant. )

## <u>MEMORANDUM OPINION</u>

**Susan Paradise Baxter, United States District Judge**

Pending before the Court in the above-captioned case are the following motions:  (1) the Plaintiffs' and Defendant's Joint Motion for Approval of Supplemental Agreement and Stipulation of Settlement, ECF No. 135; (2) Class Counsel's Application for Supplemental Attorney Fees, ECF No. 143; and (3) the "Bigley Objectors" Motion to Remove Class Counsel, ECF No. 179. [1]  For the reasons that follow, the parties' Joint Motion for Approval of Supplemental Agreement and Stipulation of Settlement will be granted.  Class Counsel's Application for Supplemental Attorney Fees will be granted in part and denied in part.  The "Bigley Objectors" Motion to Remove Class Counsel will be denied.

---

[1] This civil action was transferred from the Honorable Cathy Bissoon to the undersigned on September 17, 2018.  ECF No. 109.  For the reasons stated by Judge Bissoon in her July 26, 2018 Memorandum and Order, this Court has ancillary jurisdiction to adjudicate the pending motions.  *See* ECF No. 105 at 4-5.

I.     **Background**

The present phase of this class-action litigation concerns a dispute about the enforcement of a prior settlement agreement between the Plaintiff Class and the Defendant, Range Resources-Appalachia, LLC (hereafter, "Range" or "Range Resources").  A recitation of the relevant procedural history follows.

The underlying complaint in this matter was filed in the Court of Common Pleas of Warren County, Pennsylvania by Plaintiffs Donald C. and Louise M. Frederick, Michael A. and Paula M. Mahle, and Donald Porta ("Plaintiffs"), on behalf of themselves and other similarly-situated owners of royalty interest in gas and oil and that was produced by Range Resources.  At all times during this litigation, Plaintiffs have been represented by Attorney Joseph E. Altomare (at times hereafter "Class Counsel").  In October 2008, the case was removed to this jurisdiction, where it was assigned to then-United States District Judge Sean J. McLaughlin.

The gravamen of Plaintiffs' complaint was their claim that Range Resources had unlawfully reduced their royalty payments under the subject leases by deducting certain post-production costs (hereafter, "PPC") that Range had incurred in the process of bringing gas and oil products to market.  In their operative pleading, ECF No. 44, Plaintiffs sought an accounting, damages, and injunctive relief against Range Resources to redress these allegedly improper deductions.  After Range Resources filed its responsive pleading, the Court was advised that the parties had reached a tentative settlement. ECF No. 83 at 3.

There were two components to the settlement.  Retroactively, Range Resources would make a one-time, lump sum payment of $1.75 million to compensate class members for the alleged underpayments that had previously occurred during the time period September 15, 2004 through April 1, 2010.  ECF No. 73-1, §3.1.  Prospectively, a cap would apply to the amount of

PPC that Range would be able to deduct from its royalty payments over the remaining life of the class members' leases.  Id. §3.2.  In order to effectuate this prospective relief, the parties agreed that the class members' leases should be amended to add an agreed-upon formula for computing the future caps on PPC.  Id.[2]  To that end, the parties agreed to seek a court order that would effectuate the agreed-upon amendments by formally incorporating them into the class members' leases.  Id. §3.3.

On March 17, 2011, following notice and a fairness hearing, Judge McLaughlin issued a memorandum opinion and order certifying the class and granting final approval of the parties' operative settlement agreement (the "Original Settlement Agreement").  ECF Nos. 73-1, 83.  Contemporaneous with that ruling, and as contemplated under the parties' agreement, Judge McLaughlin entered a separate order amending the class members' leases ("Order Amending Leases").  ECF No. 84.

---

[2] In relevant part, Section 3.2(B) of the Original Settlement Agreement contemplated that the following provisions would be incorporated into every class lease:

> **Natural Gas Royalty Calculation.**  All royalty for natural gas payable under this instrument for any Accounting Period shall be calculated using the **PMCF** for the Gas Well(s), reduced by not more than the lesser of the following:
>
> (1) the pro rata royalty share of current Post Production Costs per **MCF** incurred during such period; and,
>
> (2)(a) in the case of royalty attributable to Wet Shale Gas production, the pro rata royalty share of $0.80 per **MCF**;
>
> (2)(b) in the case of royalty attributable to Dry Shale Gas production, the pro rata royalty share of $0.72 per **MCF**; or
>
> (2)(c) in the case of royalty attributable to all other nature gas production, current Post Production Costs per MCF reduced by $.03 per **MCF**.

ECF No. 73-1, §3.2(B) (emphasis added).  The proposed lease amendments defined "PMCF" to mean "the Price Per MCF, calculated by the formula: P/V where: 'P' is the total purchase price actually paid by First Purchasers for natural gas produced from a Gas Well(s) during an Accounting Period . . . and 'V' is the volume (in MCF's) of the natural gas purchased by such First Purchasers." See id. at §3.2(A).  The proposed lease amendments defined "MCF" to mean "one thousand cubic feet of volume of natural gas."

Unfortunately, the Order Amending Leases contained a discrepancy that did not conform to the terms of the Original Settlement Agreement.  Whereas the Original Settlement Agreement had established a formula for calculating the shale gas PPC cap utilizing MCFs (i.e., a measurement signifying one thousand cubic feet of volume), *see* n. 1 *supra*, the Order Amending Leases established a formula that, in the case of "Wet Shale Gas production" and "Dry Shale Gas production," utilized MMBTUs (a measurement signifying one million British Thermal Units). *See* ECF No. 84, ¶1 at 3-4; ECF No. 94 at 5.[3]

Following entry of these orders, Range Resources adjusted its royalty payments in accordance with the Order Amending Leases, but contrary to the terms of the Original Settlement Agreement, by calculating the shale gas PPC caps using MMBTUs.  Range continued to pay royalties in this manner for a number of years following Judge McLaughlin's approval of the class settlement and entry of the Order Amending Leases.

---

[3] The Order Amending Leases incorporated the following terms into class members' leases:

**(B) Natural Gas Royalty Calculation**.

(1) All royalty payable under this instrument for natural gas produced from shale formations for any Accounting Period shall be calculated using the PMCF for the Gas Well(s), reduced by not more than the lesser of the following:

   (a) the pro rata royalty share of current Post Production Costs per MCF incurred during such period; and,

   (b)(i) in the case of royalty attributable to Wet Shale Gas production, the pro rata royalty share of $0.80 per **MMBTU**; or

   (b)(ii) in the case of royalty attributable to Dry Shale Gas production, the pro rata royalty share of $0.72 per **MMBTU**.

(2) In calculating the royalty attributable to all other natural gas production, existing Post Production Costs shall be reduced by $.03 per MCF.

ECF 84, ¶¶-2 (emphasis added).

On or around July 8, 2013, Mr. Altomare became aware of the error when a class member complained to him that royalties were being improperly computed using MMBTUs. ECF No. 107-13, ¶5.  Mr. Altomare sent an email to Range's counsel that same date, noting:  "It appears from the most recent reports that the $.80 cap is being calculated against MMBTU rather than MCF as required . . ."  ECF No. 107-2.

In a return email dated July 11, 2013, Range's counsel, David Poole, Esq., confirmed that the company's "land team has been following this methodology," but stated that he had not had an opportunity to look into "whether MMbtu or Mcf is correct."  ECF No. 107-3.  Mr. Altomare replied to Range's counsel that same day, stating:

> I think we have a real problem. Paragraph 3 of the Order approving settlement [attached Doc 83] approves the terms set forth in the Second Amended Settlement Agreement [attached Doc 71-1], page 8 of which requires that MCF should be used. Correspondingly the disclosure in the Class Notice upon which settlement was approved [Doc 71-1, Ex C] calls for the same. The Order Amending Leases was to follow suit [see proposed order at Doc 71-1, Ex "D"].

> Just how the order which was actually signed [attached Doc 84] was changed to MMBTU, I do not know. I did not provide the order form to the court. My recollection is that it was submitted to the court by Range's counsel because of the logistics of having to simultaneously provide the Court with the voluminous lease data to be included in Exhibit "A" to that order. I frankly missed this discrepancy, trusting that the order submitted would be the same as the proposed order we had jointly submitted at [see Doc 71-1 at Ex "D"].

> I am less concerned with who is responsible for making the unwarranted revision as I am with correcting this discrepancy of record and obtaining an accounting.

ECF No. 107-4.  According to Mr. Altomare, Range's counsel never responded to this transmission and, thereafter, "continued to ignore the issue."  ECF No. 107-13, ¶¶6-7.

Mr. Altomare attempted to broach the MCF/MMBTU discrepancy with Range Resources' counsel again in 2014.  In an email to Mr. Poole dated March 17, 2014, Mr. Altomare

addressed a number of outstanding issues and concluded by stating:  "Lastly, we have not yet

resolved the MCF/MMBTU discrepancy in the amended class leases – I am inclined not to

press this, but we should discuss it." ECF No. 107-5.  According to Mr. Altomare, Range

Resources thereafter "continued to stonewall" his attempts to discuss the issue.  ECF No. 107-13,

¶8.

## II.   <u>Procedural History</u>

### A.   *Plaintiff's Motion to Enforce the Original Settlement Agreement*

In January 2018, Plaintiffs (through Mr. Altomare) filed a motion on behalf of the class

to enforce the Original Settlement Agreement ("Motion to Enforce"), ECF Nos. 93, claiming that

Range Resources had intentionally violated its terms by underpaying royalties through the use of

various "artifices."  Plaintiffs alleged, among other things, that:

> (a) Range has improperly calculated the [PPC] Cap by using MMBTUs (each, one
> million British Thermal Units) instead of MCFs (each, 1,000 cubic feet) as the
> multiplier required by Section 3.2(B)(1)(a) of the Settlement Agreement.
>
> (b) Range improperly deducts pipeline transportation costs (disguised in its
> Statements as "FCI-Firm Capacity") to which it is not entitled, and additionally
> fails to include such cost in its Cap calculations.
>
> (c) Until recently, Range purported to have used wellhead gas from the Class wells
> to fuel the operation of the on-site equipment it uses to gather, dehydrate, process
> and compress the gas for transport by pipeline to market. More recently, it says it
> no longer uses wellhead gas and rather purchases fuel for such purpose and has
> begun to deduct that expense from the royalty (denominated in Range's Statements
> as "PFC-Purchased Fuel") without including such cost in its Cap calculations.
> Furthermore, the Class believes that the charge for Purchased Fuel results in a
> double deduction for the same fuel.
>
> (d) Under Section 3.2(C) of the Settlement Agreement, supra, the Class royalty on
> the sale of natural gas liquids ("NGLs")[,] which are stripped and sold separately
> from the gas, is to be calculated by deducting the stripping facility's charges for
> processing from the gross proceeds of such sales. The Class believes that the gross
> proceeds reflected in the Statements are actually already net of the stripping

facility's charges. Range nevertheless deducts such charges a second time (denominated in Range's Statements as "PHI-Proc Fee").

(e) Range also improperly deducts from the NGL royalty under Section 3.2(C) of the Settlement Agreement a charge (denominated as "TAI-Transport" in its statements) for transportation of natural gas liquids ("NGL") to the stripping facility notwithstanding that the NGL's are resident in the transported gas.

\* \* \*

(g) Range has not applied the Cap in calculating the royalty due certain members of the class.

(h) Range has further intentionally issue[d] to class members monthly royalty statements ("Statements") in a format which is so complex and confusing as to be indecipherable by Class members without the assistance of an attorney or accountant knowledgeable in oil and gas accounting.

ECF No. 93, ¶3.

To redress these alleged breaches, Plaintiffs sought a preliminary order allowing Class Counsel to retain the services of an auditor and to conduct discovery relative to Range's unpaid monetary liability. In addition, the Plaintiffs requested an evidentiary hearing for the purpose of allowing the Court to consider the propriety of a cease and desist order, monetary compensation, punitive sanctions, and other forms of relief.

The Motion to Enforce was assigned to the Honorable Cathy Bissoon,[4] who denied Plaintiffs' request for a court-appointed auditor but granted the parties a 120-day period of discovery for the purpose of developing the evidentiary record relative to numerous factual issues raised by Plaintiffs' allegations. With respect to the MCF-MMBTU discrepancy, Judge Bissoon directed the parties to confer with each other about a possible resolution of that issue; failing that, she permitted them to "develop the record as it may relate to the propriety of relief

---

[4] The instant civil action was transferred to Judge Bissoon on January 25, 2018 in light of former Judge McLaughlin's resignation from the federal bench in 2013.

under Rule 60, the applicability or non-applicability of laches, the extent of class damages, or any other issues that the parties may deem relevant."  ECF No. 105 at 11.

### B.  *Plaintiff's Motion for Relief Under Rule 60*

On September 11, 2018, while discovery was proceeding, Plaintiffs filed a motion pursuant to Rule 60(a) of the Federal Rules of Civil Procedure ("Rule 60(a) Motion").  ECF No. 106.  Through this motion, Plaintiffs sought to correct the MMBTU discrepancy in the Order Amending Leases so as to bring that Order into conformity with the terms of the Original Settlement Agreement.  Id.  On September 17, 2018, while the Rule 60(a) Motion was being briefed, the case was transferred to the undersigned.  ECF No. 109.

In October 2018, Range Resources requested the appointment of a mediator for the purpose of attempting to settle all outstanding issues relevant to Plaintiffs' Motion to Enforce and Rule 60(a) Motion.  See ECF No. 116.  The case eventually proceeded to mediation before Thomas Frampton, a former judge of the Mercer County Court of Common Pleas.  On January 30, 2019, former Judge Frampton reported that the parties had mediated their dispute to a successful resolution.  ECF No. 133.

### C.  *The Parties' Joint Motion for Approval of the Supplemental Settlement*

Several months later, the parties filed their Joint Motion for Approval of the Supplemental Agreement and Stipulation of Settlement (hereafter, "Supplemental Settlement" or "Supplemental Settlement Agreement").  ECF No. 135.  Like the Original Settlement Agreement, the Supplemental Settlement Agreement contains two separate components.  To address past shortfalls in royalty payments, Range Resources would pay the Class a one-time lump sum of $12 million, less any costs and fees awarded to Class Counsel.   ECF No. 135-1, ¶2.  As a prospective measure, Range Resources would adopt the formula for calculating future PPC

8

caps for shale gas that was set forth in the Original Settlement Agreement, using MCFs as the relevant volumetric measurement, rather than MMBTUs.  See ECF No. 73-1, §3.2(B).  Range Resources would also record, in the relevant offices of the county recorder of deeds, a certified copy of an Amended Order Amending Leases, which would effectuate the intended change in PPC calculations for each of the subject leases.  ECF No. 135-1 at 8-9.  In exchange, the Class would grant Range Resources a broad release of any and all claims that might be asserted, based upon the facts that gave rise to the Plaintiff's Motion to Enforce the Original Settlement Agreement.  Id. at ¶4.

After receiving notice of the proposed Supplemental Settlement, the Court scheduled a fairness hearing for August 14, 2019 and directed Range Resources to mail notice of the proposed settlement to class members at least sixty days in advance of the hearing.  ECF No. 141.  The Court allowed class members to file objections to proposed settlement up to ten (10) days before the hearing.  Id.

### D.  Class Counsel's Application for Supplemental Attorney Fees

In the meantime, Mr. Altomare filed his "Application for Supplemental Attorney Fees." ECF Nos. 143, 144.  In this motion, Mr. Altomare requests a fee of twenty percent (20%) of the value of the combined retroactive and prospective payments.  With regard to any increases in future royalty payments to class members, Mr. Altomare states that he is "willing to limit his request" to a ten-year period, but he requests that he be awarded twenty percent (20%) of these future benefits "as and when they monthly accrue."  ECF No. 143 at 16, 22.  Since Range Resources has estimated that the future increase in royalty payments to the class will average approximately $1,331,135.00 annually over the next five years, Mr. Altomare estimates that the class would reap an aggregate increase in royalties of approximately $13,311,352.00 over the

next ten years.  His total requested fee award would therefore approximate $5,062,270.00, calculated as follows:

| Supplemental Settlement | Common Fund | Fee @ 20% |
|---|---|---|
| Retroactive Payment | $12,000,000 | $2,400,000 |
| Future Increase (Limited to 10 Yrs.) | $13,311,352 | $2,662,270 |
| **Sub-Totals** | **$25,311,352** | **$5,062,270** |

ECF No. 143 at 20.

### E.  The Filing of Objections

On July 26, 2019, Range Resources filed objections to the portion of Class Counsel's fee request associated with the prospective royalty payments.  ECF No. 145.  Range objected to this aspect of the fee application on three grounds.  First, it argued that Mr. Altomare's request is inconsistent with the terms of the parties' settlement agreement, wherein Class Counsel agreed to a one-time payment of $12 million, less Mr. Altomare's fees and costs.  Id. at 1 (citing ECF No. 135, Exhibit A).  Second, Range argued that this fee request improperly affects those holding royalty interests in non-shale gas wells, and would impose a significant administrative burden that Range never agreed to undertake.  Third, Range argued that this aspect of the fee request is inappropriate because the Motion to Enforce only implemented the terms of the Original Settlement Agreement, and Class Counsel has already been compensated for this benefit.

Over the ensuing weeks, various absent class members submitted additional objections to both the proposed settlement and Class Counsel's fee request.[5]  On August 2, 2019, materially

---

[5] An objection filed by Edward Zdarko, ECF No. 142, was later withdrawn.  See ECF No. 176. Consequently, the substance of that objection will not be addressed in this memorandum opinion.

identical objections were filed by four class members[6] represented by the law firm Houston Harbaugh, P.C., and collectively referred to herein as the "Aten Objectors."  See ECF Nos. 155, 156, 157, 158, 161.  This group argued that:  (1) the Court lacks jurisdiction over the Supplemental Settlement because the "class" contemplated by the new agreement is inconsistent with the "class" that was originally certified by Judge McLaughlin; (2) the Supplemental Settlement creates an intra-class conflict by essentially picking "winners" and "losers"; (3) the Supplemental Settlement fails for lack of consideration; (4) the parties have not demonstrated that class members received notice of the Supplemental Settlement; (5) the Supplemental Settlement is unfair to the class because counsel's fee request unfairly dilutes class members' interests and is not commensurate with the result achieved; and (6) the Court should explore other available remedies, such as voiding the release clause, allowing objectors to opt out of the Supplemental Settlement, and/or re-certifying the class based on the definition proposed under the Supplemental Settlement.

On August 4, 2019, objections were filed on behalf of approximately four dozen objectors[7] represented by Roetzel & Andress, LPA and Neighborhood Attorneys, LLC, and

---

[6] These objectors include George M. Aten, Raymond W. Seddon, Jr., Leon C. Chow, and James H. Post.

[7] These objectors include Roseann M. Bigley, Richard G. and Cheryl F. Kearney, Robert H. and Sandra Murphy Hallam, Bruce R. and Sherry L. Varner, Dennis M. and Kimberly J. Jackson, Thomas K. and Sandra M. Brownlee, William K. and Deborah Zlatarich, Larry N. and Kandy S. Cerciello, Walnut Ridge Inc., James A. Rupert, Cynthia S. Carmella, Dorothy Diane Terhorst, Gary and Paula Watson, J&L Campbell Family LP, Estate of Mildred S. Shaw, Shaw Family, LP, Paul D. and Betty J. Shaw, Wagers Apple Crest Orchards LLC, Jill Craig, Dryer Farms, LP, Donald D. and Melissa A. Dryer, Elizabeth D. Nijenhuis, Donald Dean Dryer, Trustee, Special needs Trust f/b/o Benjamin David Dryer, Lisa Hamilton, Karen Liggett, Laura Smith, Trustee, George G. Goettel Testamentary Trust, Laura Smith, Trustee, Cynthia L. Goettel Trust, Laura Smith, individually, Jack C. and Sondra L. Carmicheal, Brush Run Ventures LP, Grier and Diane M. Adamson, Brian and Terri Jeffers, and Catherine Mancuso.

collectively referred to herein as the "Bigley Objectors."  See ECF No. 160.  These objectors lodged the following arguments.  First, they asserted that the Supplemental Settlement should be rejected on the grounds that Class Counsel inadequately represented the class and has a demonstrable conflict of interest with class members.  Second, they suggested that Mr. Altomare may have submitted fraudulent time entries in connection with his fee application.  Separate from this, the Bigley Objectors argued that the fee request is excessive under the circumstances of the case and in light of the results achieved by Mr. Altomare.  Finally, the Bigley Objectors asserted that, if the Court does not disapprove of the Supplemental Settlement, then they should be permitted to opt out of it.

In support of their arguments, the Bigley Objectors proffered the affidavit of Ryan J. Rupert, a certified public accountant, minerals manager and evaluation analyst who has assisted many class members and has consulted with Mr. Altomare relative to issues bearing on the Motion to Enforce the Original Settlement Agreement and the Rule 60(a) Motion.  ECF No. 160-1 at 1-5.  In his affidavit, dated August 4, 2019, Mr. Rupert stated that he has evaluated thousands of Range Royalty statements for leases subject to the *Frederick* PPC cap and has come to believe that Range was systematically underpaying his clients in a number of ways, including by:  impermissibly calculating the cap on an MMBTU basis; failing to properly capture all items of expense that were subject to the cap (such as gathering, dehydration, compression, marketing, and transportation costs); improperly deducting gathering and transportation fees for natural gas liquids ("NGLS'); at times, improperly deducting gathering fees on natural gas and NGLs drawn from the same well; and, in some cases, failing to apply the cap altogether.  ECF No. 160-1 at 2,

---

Two of these objectors – Wagers Apple Crest Orchards, LLC and Jill Craig – are lessors under leases that were granted in 2013, and are not subject to the Original Settlement Agreement.  ECF No. 167-1, ¶10.  As such, they are not members of the class.

¶7.  Mr. Rupert stated that he reached out to Mr. Altomare regarding these issues in August 2017 and continued thereafter to periodically advise Mr. Altomare concerning the expenses that he believed Range was improperly deducting from class royalties.  Id. at 2-3, ¶¶9-10.

Mr. Rupert also attested that he had reviewed Class Counsel's Application for Supplemental Attorney Fees and came to suspect that many of Mr. Altomare's time entries had been taken from Mr. Rupert's own billing statements.  ECF No. 160-1, ¶¶16-17.  An exhibit to Mr. Rupert's affidavit showed that, on January 9, 2018, Mr. Altomare asked Mr. Rupert to provide time sheets for all of his work on the case so that Mr. Altomare could submit an invoice to the Court on Mr. Rupert's behalf.  ECF No. 160-1 at 6.  Mr. Rupert did so, having documented some 923.25 hours of time from the point of the original settlement through January 31, 2018.  Id. at 3, ¶12; see also id. at 7-19.  According to Mr. Rupert, his hourly fee during that time-span ranged from $200 to $250 per hour, ECF No. 160-1 at 3, ¶12; therefore, his total fees would have ranged from somewhere between $184,650 (if charging $200 per hour) to $230,812.50 (if charging $250 per hour). On February 1, 2019, Mr. Altomare emailed Mr. Rupert to inform him of the settlement ECF No. 160-1 at 20.  Mr. Altomare indicated that he planned to submit an invoice to the Court for Mr. Rupert's services but felt uncomfortable with the billing statement that Mr. Rupert had provided, "as the total seem[ed] much to high" to "adequately justify to the court."  ECF No. 160-1 at 20.  Mr. Altomare noted he had "trimmed" Mr. Rupert's billing statement "considerably so as to arrive at a number I believe I can get for your services[,]" and he asked Mr. Rupert to indicate whether he thought it was "ok."  Id.; see also ECF No. 160-1 at 21-29.

Mr. Rupert also attested that, after reviewing Mr. Altomare's application for attorney fees and supporting billing statement, he discovered that "many of the time entries submitted by

Attorney Altomare appeared to be taken from the Rupert Time Detail [he] had previously submitted to Attorney Altomare."  ECF No. 160-1 at 3, ¶17.  As an example, Mr. Rupert pointed to a June 16, 2016 time entry where Mr. Altomare billed 30 minutes of time under the heading "Investigate Range Breach of Settlement, with attention to "William H. Knestrick: Estate of Cora M. Miller."  Id., ¶18.  Mr. Rupert stated that, to the best of his knowledge, Mr. Altomare never met with or spoke to Mr. Knestrick.  Id. at 3-4, ¶¶19-20.

### F.  Class Counsel's Response to Objections

Mr. Altomare submitted his response to the foregoing objections on August 12, 2019. ECF No. 171.  In response to Range's objections, Mr. Altomare conceded that his proposed request for the 10-year prospective fee award should be amended so that it does not affect class members who own interests in non-shale gas wells.  Nevertheless, Mr. Altomare insisted that his requested fee is otherwise justified by the future benefits that the Supplemental Settlement Agreement will confer upon those who hold royalty interests in shale gas wells.  Mr. Altomare further denied that implementing the prospective fee award would create any increased burden on Range Resources, that it is contrary to the notice that was sent to the class, or that it constitutes an impermissible "double-dipping" of fees.

In response to the objecting class members, Mr. Altomare denied that the proposed Supplemental Settlement requires a separate class certification process or an opportunity for opting out.  He also denied that his actions in negotiating the Supplemental Settlement were self-serving, stating:

> There can be no question that the Motion for Enforcement of the original settlement agreement [Doc. 93] was vigorously prosecuted and defended by both parties, often with a modicum of rancor arising from Range's resistance to fully responding to Class Counsel's written discovery requests seeking its business records from which Class counsel could properly determine both the merits of the class default claims and the amount of damages following upon those merits.

> Despite repeated demands, made over a period of months, Range continued to vehemently resist providing all of the records which Class Counsel regarded as essential. During this resistance, Range moved for an order to mediate [Doc 117], which Class Counsel opposed precisely because he still was without the necessary records [Doc 118]. It was only following the Court's Text Order of October 26, 2018 [Doc 123], which both ordered mediation and required that Range explain its resistance to Class Counsel's discovery requests, that Range ultimately relented and provided full responses to Class Counsel's satisfaction.  That ultimate production consisted of voluminous electronic data reflecting Ranges [sic] individual computation of royalty payments since 2011 to *each class member*, for *each month* and for *each year* through 2018.  That production contained more than 12 million total data points and Class counsel was constrained to analyze that data, consuming an extraordinary number of hours of his time on behalf of the class.  There can therefore be no doubt that the Range and Class Counsel were at palpable arm's-length on the eve of, and at the mediation conducted before former Judge Thomas Frampton on January 30, [2019].

ECF No. 171 at 7-8 (emphasis in the original).

Insofar as the objectors expressed dissatisfaction with the release provision in the Supplemental Settlement Agreement, Mr. Altomare posited that this is an inherent and accepted aspect of any settlement agreement.  Further, Mr. Altomare explained the reasons why he concluded that the other claims in the motion to enforce were not actionable:

(i)     Improper deduction of transportation costs ("TAI-Transport") From NGLS.  Defendants responded to this claim by explaining that Plaintiffs have misread the royalty statement and therefore mischaracterized this transportation charge as applying to NGLs, when in fact, it only applied to gas.  Counsel found this defense to be meritorious.

(ii)    Charging "double" for Purchased Fuel. Defendants had already stopped the practice and credited the class members for the overcharges.

(iii)   Double-charging processing fees ("PHI-Proc Fee") associated with natural gas liquids (NGLs).  Range denied that it was doing so, but the settlement Agreement came to include a promise that they will not do so into the future (even though they deny that they did so in the past).  Whether they did so in the past or not was not in Class counsel's opinion worth litigating given the prospective remedy obtained, coupled with the overall benefits of the settlement.

(iv)    Failing to adhere to minimum royalty provisions in some Class members' leases.  This was already disposed of in Range's favor by the Court [Opinion, Doc. 105, pp. 13-14].

(v)     Failing to apply the "cap" in calculating royalty due to certain Class Members.  Class Counsel concluded that this issue was an individual issue not litigable on a class-wide basis and therefore improvidently asserted.

15

(vi)     Issuing complex and confusing royalty statements.   This issue was addressed but not
          disposed of by the Court [Opinion, Doc. 105, p. 15].  As this was an administrative issue
          not addressed in the settlement agreement and the statements in any event *do* contain all
          that is required under the governing Statute (58 P.S. §35.2), Class Counsel concluded that
          this issue did not warrant pursuit in view of the benefits of the overall settlement.

(vii)    Failure to include the "FCI-Firm Capacity" as a pro-rated cost subject to the cap.   The
          Court had already ruled on this issue in favor of the Class [Opinion, Doc. 105, p 12].

ECF No. 171 at 8-9.

        In response to the affidavit of Ryan Rupert, Mr. Altomare adamantly denied that he

committed any type of fraud with respect to his billing submissions.  With respect to the columns

in Class Counsel's time sheets that contained the heading "Attention to" and entries for time

billed by Class Counsel in reference to Mr. Rupert's clients, Mr. Altomare explained that those

entries had nothing to do with Mr. Rupert's services to the named clients but instead represented

"time spent by Class Counsel in consultation with Mr. Rupert . . .  concerning the issues . . .

brought to him by those persons." ECF No. 171 at 9.  To buttress this explanation, Mr. Altomare

produced his billing sheets in an expanded form, along with the original metadata, which showed

that he had entered notations characterizing these charges as "Expert Consultation – Ryan J.

Rupert, CPA, CMM."  Id. at 10; ECF Nos. 171-3 and 171-4.  As further proof that he was not

simply stealing Mr. Rupert's personal time entries, Mr. Altomare noted that his "Expert

Consultation" entries totaled .5 hours, meaning that he billed the class for only ½ hour for each

consult; Mr. Rupert's time entries, on the other hand, reflected greater amounts of time spent

with these same clients.  ECF No. 171 at 10.  Mr. Altomare acknowledged that his billing entries

were not based upon contemporaneous time records; he explained that "the substance of each

consultation with Mr. Rupert inevitably immediately triggered additional time spent and

recorded for the class itself," and "Counsel did not have the presence of mind to record the date

and time of each of the consults which spawned that work."  Id.  Nevertheless, Mr. Altomare

maintained the time reported is "well within what would be fairly expected given the 1,112 pages

of emails . . . and 292 pages of spreadsheet analyses and documentation provided to counsel by

Mr. Rupert during the 5 years of counsel's investigation and ultimate prosecution of the class

clams." Id. at 11; see ECF Nos. 171-6 and 171-7. Mr. Altomare further posited that his consult

estimations are consistent with Mr. Rupert's own invoice to Class Counsel because, "if Mr.

Rupert were charging counsel for his work with those individuals, surely there had to be a

corresponding consult [with Mr. Altomare]." ECF No. 171 at 11. Finally, Mr. Altomare

maintained that any allegation of fraud is belied by the fact that, in submitting his billing records,

he "voluntarily and considerably, reduced his hours." Id.

### G. The Fairness Hearing

Following the acceptance of additional filings, ECF Nos. 163, 165, 167, and 172, the

Court conducted the fairness hearing on August 14, 2019. In relevant part, the Court heard

testimony from Mr. Rupert as well as testimony from Ruth Whitten, Range Resources' Director

of Land Administration.

Mr. Rupert explained his familiarity with Range's royalty statements and the manner in

which he assists his clients by reviewing and evaluating their royalty statements in order to

ensure that the clients are receiving the full payment to which they are entitled under their

respective mineral leases. Among the clients whom Mr. Rupert advises is Linda Shaw, a Bigley

Objector who appeared at the fairness hearing and offered into evidence several of her family's

royalty statements.

Using the Shaw family's statements as examples, Mr. Rupert testified about the

information contained in Range Resources' royalty statements and some of the accounting issues

he discovered as a result of reviewing those statements that gave rise to the motion to enforce the

Original Settlement Agreement.  With respect to the MCF/MMBTU discrepancy, Mr. Rupert stated that he first raised this issue with Mr. Altomare in 2014, after reviewing the Court's Order Amending Leases.  Hrg. Tr. at 83-85.  Although he and Mr. Altomare had a telephone conversation about the matter, id. at 85, Mr. Rupert claims those conversations did "[n]ot really [go] anywhere."  Id. at 84.  Sometime later, Mr. Rupert concluded that the PPC cap was not being consistently applied, even on an MMBTU basis, even though it appeared from the codes on Range's statements that the cap *was* being applied.  Id. at 78, 83.  To test his hypothesis, Mr. Rupert undertook a lengthy analysis of all his clients' royalty statements, examining each statement on a per-well line-item basis.  Id. at 83.  He informed Mr. Altomare sometime around August 30, 2017 that the PPC cap was not being applied on a "systematic and pervasive basis."  Id. at 82.  At Mr. Altomare's request, Mr. Rupert forwarded his analyses and also shared some background information about what he had done so that Mr. Altomare could raise the issue directly with Range Resources' personnel.  Id. at 83.  He acknowledged on cross-examination that the issues he had spotted concerning FCI charges, the MCF/MMBTU differential, the complexity of Range's statements, and the deductions taken on NGLs were all issues that Mr. Altomare raised in the Motion to Enforce. Tr. at 130-32.  Mr. Rupert further acknowledged being made aware that Range had changed its practice to start including FCI charges in the PPC cap after Mr. Altomare raised that issue in the Motion to Enforce.  Tr. at 130-31.

Mr. Rupert also testified about various inaccuracies he perceived in Mr. Altomare's revised billing statement, which had been submitted to the Court as an exhibit to ECF No. 171. He claimed that many time entries listed on Mr. Altomare's revised client statement were his own and not Mr. Altomare's.  Hrg. Tr. at 102.  As an example, Mr. Rupert stated that the time

entry for the "Whittingtons"[8] referenced a file path name that actually came from his own computer.  Id. at 103.  Mr. Rupert also cited a time entry for the client "Mohawk Lodge," which was grouped into information sent to Mr. Altomare but has nothing to do with this litigation because "Mohawk Lodge" is not a member of the *Frederick* class.  Id. at 104.  In addition, Mr. Rupert recalled that his initial contact with Mr. Altomare occurred in April 2014; he therefore posited that all of the billing entries Mr. Altomare listed in his revised statement relative to conferences that allegedly occurred between Mr. Rupert and Mr. Altomare prior to April 2014 cannot be accurate.  Id. at 105-06.  Moreover, Mr. Rupert noted that Class Counsel's revised billing statement documents consultations between Mr. Rupert and Mr. Altomare for approximately thirty-two (32) of Mr. Rupert's clients as to whom no consultation ever occurred. Id. at 106-07.

On cross-examination, Mr. Rupert acknowledged that he had sent Mr. Altomare, at Mr. Altomare's request, his own records of time spent working on the PPC cap issues with the understanding that Mr. Altomare would submit those time records to the Court and seek reimbursement of Mr. Rupert's time.  Id. at 109.  Mr. Rupert further acknowledged that Mr. Altomare had shown him the proposed revised billing statement prior to filing it with the Court and Mr. Rupert had not raised any objection to its filing, having told Mr. Altomare that he "trusted [Mr. Altomare's] judgment."  Id. at 111.

The Court also heard testimony from Ruth Whitten, who was questioned by Mr. Altomare as on cross-examination.  Ms. Whitten manages Range Resource's Land Administration Department, which maintains the internal computer files that pertain to the payment of royalties.  Hrg. Tr. at 136.  Based on this data, Ms. Whitten's staff members

---

[8] It appears the transcription may be a misspelling of an intended reference to "Wigington."

determine what each royalty owner's division of interest ("DOI") is relative to a particular well and what their net royalty payment will be each month, after accounting for income and deducted expenses.  Id. at 135-36.  Using this data, Ms. Whitten produced certain information for Mr. Altomare about the class members' respective DOIs for royalties that were generated relative to specific wells.  Id. at 137-39; Hrg. Ex. 2.  Through Ms. Whitten's testimony, Mr. Altomare sought to establish the feasibility of Range Resources assigning him a .0033 DOI in the future royalties paid to class members.  See Tr. at 140-150; Hrg. Ex. 5-B.  Under Mr. Altomare's model, each class member's respective DOI would be reduced by .0033, such that the collective class share of future royalties diverted to Mr. Altomare would amount to a twenty percent (20%) fee.  Tr. 146-47.

Ms. Whitten took issue with the feasibility of this model, stating that it would require some 480 man hours to establish the type of payment scheme that Mr. Altomare was requesting, because RR's DOI files are organized on a well-by-well basis rather than an owner-by-owner basis.  Tr. at 148.  Ms. Whitten admitted that she had not consulted Range's IT department in arriving at her conclusions about feasibility, but she testified that she worked with the company's IT group enough and manipulated the database files herself enough to "know what our business standards are to do those types of things."  Id. 148-49.

### H.  Post-Hearing Filings

At the conclusion of the motion hearing, the Court ordered supplemental briefing by the parties and objectors.  ECF No. 174.  This supplemental briefing has since been received and reviewed by the Court.  See ECF Nos. 177, 178, 180, 181, 188, 189, 190, and 192.  The Bigley Objectors also filed a motion to remove Class Counsel, based on the arguments and testimony

developed at the fairness hearing.  ECF No. 179.  The parties have briefed this issue as well.

ECF Nos. 183, 190, 191, and 194.

Finally, during its review of these pending matters, the Court directed the parties to

conduct briefing on certain discrete issues, namely: (i) the extent of this Court's authority under

Rule 23(e)(4) as it relates to opt out procedures in the context of this case; (ii) the extent to which

class members who hold only royalty interests in leases associated with conventional oil and gas

wells are benefited, bound, or otherwise affected by the proposed Supplemental Settlement; (iii)

whether it would be appropriate or necessary to certify a settlement subclass that would exclude

class members holding royalty interests under leases associated with conventional oil and gas

wells; and (iv) whether Range Resources concurs with Class Counsel's assertion that Range's

covenants in the proposed Supplemental Settlement Agreement subsume a promise to correct,

into the future, the issues identified in Class Counsel's Post Fairness Hearing Brief. ECF No.

197.  The parties have submitted their responses to the Court's inquiries.  See ECF Nos. 198,

199, 200, 201, 204.

Having conducted the aforementioned fairness hearing and having reviewed all of the

pre-hearing and post-hearing filings, the Court turns to the pending motions.

### III.    Motion to Approve Settlement

Pursuant to Federal Rule of Civil Procedure 23, "[t]he claims, issues, or defenses of a

certified class . . . may be settled, voluntarily dismissed, or compromised only with the court's

approval."  Fed. R. Civ. P. 23(e).  The following procedures apply:

(1) The court must direct notice in a reasonable manner to all class members who
would be bound by the proposal.

(2) If the proposal would bind class members, the court may approve it only after a
hearing and only on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e).

Fed. R. Civ. P. 23(e)(1)(B), (e)(2)-(e)(5)(A).

### A. Jurisdictional and Notice Requirements

Rule 23(e)(1)(B) requires, in relevant part, that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal[.]"  Additionally, "due process further requires that notice be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435 (3d Cir. 2016), *as amended* (May 2, 2016) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  As a general matter, "the notice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class."  *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013).  For a class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

Here, the Aten Objectors have expressed concern about whether class members received adequate notice of the proposed Supplemental Settlement so as to satisfy the requirements of due process.  Inferring that Range has utilized its royalty payment database as a means of identifying

22

class members and providing notice of the Supplemental Settlement, the objectors contend that this approach fails to address class members who sold their royalty interests years ago. Because the class originally consisted of over 20,000 persons, the Aten Objectors submit it is likely that certain members are no longer receiving royalties from Range and have not given Range their updated contact information. Thus, the objectors posit, the Supplemental Settlement will always be open to challenge by those who did not receive notice, and there will be "no certainty or benefits to Class members," because "payments under the Supplemental Settlement are contingent upon the expiry of an appeal period – which will never close." ECF No. 161 at 18.

Range Resource's efforts to notify the Class about the proposed Supplemental Settlement are outlined in the declaration of Ruth Whitten, Range's Director of Land Administration. ECF No. 167-1. Ms. Whitten's job duties include overseeing the management of Range's master computer files for owner set-up and interest percentage participation in wells, information that is used for the distribution of revenues. Id., ¶3. In her August 9, 2019 declaration, Ms. Whitten attests to the following:

> 4. Upon review of its business records, Range identified 11,882 total class members ("Class Members"), made up of the following categories: Category 1, consisting of 5,296 royalty owners who have received payments from shale wells from 2001 through the April, 2019 revenue distribution; Category 2, consisting of 6,048 royalty owners who are associated with class leases that have no shale gas production but have leases associated with conventional oil and gas wells; and Category 3, consisting of 538 royalty owners associated with class leases that have not yet been developed.
>
> 5. Pursuant to the Court's May 22, 2019 Order, on May 31, 2019, Range mailed the Notice of Supplemental Agreement and Stipulation of Settlement ("Notice of Supplemental Agreement"), attached to the ECF No. 141, via U.S. First Class Mail, to the addresses Range had in its records for all 11,882 Class Members.
>
> 6. Of the 11,882 mailings, 391 were returned by the post office as undeliverable.
>
> 7. Range conducted further research into the addresses of the Class Members for which Notices of Supplemental Agreement were returned, using both Range's internal files and the Accurint software. Approximately 100 of the Class Members

for which mailings were returned are deceased.  Range was able to successfully locate new addresses for, and re-send Notices of Supplemental Agreement to, 102 of these Class Members.  Range was unable to locate addresses for the remaining Class Members.

8. In total, based on its initial mailing and supplemental mailing, Range successfully provided notice to 11,593 of 11,882, or 97.5 percent of Class Members.

ECF No. 167-1, ¶¶4-8.

Based on the affidavit of Ms. Whitten, the Court finds that the notice requirements of Rule 23 have been satisfied, as direct notice was sent in a reasonable manner to all class members who would be bound by the Supplemental Settlement.  Indeed, counsel for the Aten Objectors acknowledged at the fairness hearing that he was not personally aware of any original class member who did not receive notice of the Supplemental Settlement.  Tr. at 20:4-7.

The Aten Objectors, however, have also asserted a jurisdictional challenge on the grounds that the "class," as contemplated by the Supplemental Settlement, is not the same "class" that was certified by Judge McLaughlin in connection with the Original Settlement Agreement.  They contend that the original settlement class was defined in terms of "persons" who were parties to a certain class of leases, whereas the Supplemental Settlement contemplates a class defined in terms of the leases themselves.  Thus, in the objectors' view, the proposed Supplemental Settlement impermissibly expands the original class by including individuals who are present-day transferees and successors-in-interest to the original class members.  As stated by counsel for the objectors, "the original class is the class.  To the extent that class counsel and Range Resources are treating those who succeeded in interests of class members as part of the class, that's where I draw a distinction."  Hrg. Tr. at 19:13-17.

After a review of all relevant filings, the Court finds no merit in the Aten Objectors' jurisdictional challenge.  It is true that Judge McLaughlin certified a settlement "class" defined by "persons" who held a specific classification of royalty interest at the time of certification.

24

Specifically, Judge McLaughlin's March 17, 2011 Order certified a class that (subject to certain exclusions) consisted of "Persons who held a Royalty Interest in any Pennsylvania and/or Ohio oil and/or gas estate at any time after September 15, 2004 that was, is or became Owned by Range, its predecessors or affiliates at any time prior to [March 17, 2011]."  ECF No. 83 at 25. This was consistent with the definition of the class as set forth in the Original Settlement Agreement.  See ECF No. 73-1 at §2.2.

However, Section 1.6 of the Original Settlement Agreement also defined the term "Class Member" to include "a member of the Class, and such members [sic] successors and assigns." *Id.* at §1.6.  Thus, it was expressly contemplated by both Plaintiffs and Range Resources that the "successors and assigns" of any original class members would be included within the "Class" and thereby subject to the terms of the Original Settlement Agreement.  Judge McLaughlin's March 17, 2011 Order certifying the class and Order Amending Leases expressly approved and incorporated by reference the terms of the Original Settlement Agreement, which would include Section 1.6.  See ECF No. 83 at 26; ECF No. 84 at 2.  Thus, successors and assigns are technically included as members of the class that Judge McLaughlin certified.

The Court is satisfied that this result does not violate the due process rights of the Aten Objectors or any other royalty interest holder who may have succeeded to the rights of original class members.  The Order Amending Leases was publicly recorded for each of the subject leases throughout 25 counties.  Thus, any purchaser or transferee who succeeded to the contractual rights of original class members after March 17, 2011 did so with constructive notice that the underlying lease was subject to the terms of the Original Settlement in this class action litigation.  The Original Settlement Agreement and order approving same were also matters of public record.  As a result, every new royalty interest holder who became a successor to an

original class member accepted those contractual rights subject to the terms of the Settlement and with notice that they would be considered members of the original settlement class. For these reasons, the Court is satisfied that it has continued jurisdiction over the Class and that the Court's exercise of jurisdiction in this regard accords with the requirements of due process.

**B.   Identification of the Supplemental Settlement**

The requirements of Rule 23(e)(3) have been satisfied as well, since the proposed Supplemental Settlement Agreement has been filed of record at ECF No. 135-1. In addition, an online link to the Supplemental Settlement Agreement was provided in the notice that was sent to class members. *See* ECF No. 141-1.

**C.   Procedure for Objections**

In accordance with Rule 23(e)(5), class members were given an opportunity to file objections. As discussed herein, various objections were received by the Court; all have been thoroughly reviewed and considered. One objection lodged by Edward Zdarko was later withdrawn, with the approval of the undersigned. ECF Nos. 142, 176. The remainder of the pending objections are addressed in the analysis that follows.

**D.   Fairness Hearing and Standards for Approval of the Supplemental Settlement**

As noted, a fairness hearing was conducted by the Court on August 14, 2019. The objectors and parties had an opportunity to submit testimony and evidence in support of their respective positions. In addition, the Court accepted post-hearing submissions by all parties and remaining objectors. The settling parties now ask the Court to approve the Supplemental Settlement as "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent*

*Actions*, 148 F.3d 283, 299 (3d Cir. 1998).  When called upon to make such a decision, the court must "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001).  In fulfilling this duty, the court acts as a "fiduciary guarding the rights of absent class members" by ensuring that the proposed settlement is fair to all members of the class.  *Id.*

In 2018, Congress amended Rule 23 to codify a list of factors that would guide the district court's decision in this regard; specifically, courts should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Rule 23(e)(2) factors overlap substantially with the nine factors set forth in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), that have traditionally guided courts within this circuit.  Under *Girsh*, courts facing class settlement approval decisions consider:  (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.  *Id.*

The *Girsh* factors are not considered exhaustive, however.  The U.S. Court of Appeals for the Third Circuit has advised that, where relevant, district courts may consider additional factors (commonly referred to as the "*Prudential*" factors), such as:

> [T]he maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re AT & T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006) (citations omitted); *see In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d at 323.

More recently, in *In re Baby Products Antitrust Litigation*, the Court of Appeals instructed district courts to also consider "the degree of direct benefit provided to the class" from the proposed settlement.  708 F.3d at 174.  "In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." *Id.*; *see In re: Google Inc. Cookie Placement Consumer Privacy Litig.,* 934 F.3d 316, 324 n.6 (3d Cir. 2019).

As proponents of the Supplemental Settlement, the Class and Range Resources bear the burden of proving that the proposed settlement is fair, reasonable, and adequate.  *See In re NFL League Players Concussion Injury Litig.*, 821 F.3d at 437 ("The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement.") (citation

omitted).  There a "strong judicial policy" in favor of class action settlements, *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2010), and a settlement should be accorded an initial presumption of fairness where (1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.  *In re NFL Players Concussion Injury Litig.,* 821 F.3d at 436.  The "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009).

  E.  <u>Analysis</u>

  With these principles in mind, the Court sets forth its analysis of the relevant factors below.

**<u>Presumption of Fairness Criteria</u>**

  The Court first considers whether it should accord an initial presumption of fairness to the Supplemental Settlement.  For the reasons that follow, the Court concludes that a presumption of fairness is appropriate.

  1.  <u>The Proponents of the Settlement Are Experienced Litigators.</u>

  First, there is no dispute in this case that the proponents of the Supplemental Settlement are experienced litigators in the field of oil and gas law.  Range Resources is principally represented by Justin H. Werner, Esq. of Reed Smith LLP and Attorney Kevin C. Abbott, both of whom have extensive experience in oil and gas matters and have tried and settled similar class actions, including the settlement of royalty claims in this district.  *See e.g., Marburger et al. v. XTO Energy Inc.*, Case No. 2:15-cv-910 (W.D. Pa.).  The Class is represented by Joseph E. Altomare, who is well known to the Court and has practiced oil and gas law for over forty years.

Mr. Altomare was appointed by Judge McLaughlin to represent the class based on his experience and expertise in oil and gas law.  He is the same attorney who negotiated the Original Settlement Agreement, which was approved by Judge McLaughlin.  Mr. Altomare's involvement in oil and gas cases includes numerous civil actions litigated within this jurisdiction, including other class actions.  *See* ECF No. 143 at 5-7.  The Court finds that the attorneys advocating for approval of the Supplemental Settlement are experienced in the field of oil and gas law.

### 2.   Only a Small Percentage of Class Members Have Lodged Objections.

Second, only a small fraction of the Class has objected to the proposed Supplemental Settlement.  Of the 11,593 class members who were sent notice of the proposed settlement, fewer than 55 have objected, amounting to less than ½ of one percent of the class.

### 3.   Discovery was Sufficient for a Fair Evaluation of the Class's Claims.

Third, the discovery in this case was sufficient to ensure a fair evaluation of the class's claims.  Objections have been lodged that Mr. Altomare did not sufficiently evaluate all of the claims in the Motion to Enforce, that he conducted only document discovery without the benefit of any depositions, and that he merely accepted Range's own estimation of the potential damages.  Upon review of the record, the Court finds these objections to be meritless.

The record shows that formal discovery in this case commenced in late July 2018 after Judge Bissoon issued her Memorandum and Order granting certain aspects of Plaintiffs' Motion to Enforce and denying other aspects without prejudice.  Although Mr. Altomare had asked the court to appoint an auditor, Judge Bissoon denied that request and directed the parties to engage in standard discovery to be completed by November 23, 2018.  ECF No. 105.

Thereafter, Mr. Altomare served two sets of requests for production of documents.  His first request broadly sought all electronically stored information (ESI) that Range used in making

royalty calculations for every class member for every accounting period during which a royalty was paid.  ECF No. 181-2 at 7.  Class Counsel's second request sought statements and records related to Range's "TAI-Transport," "PHI-Proc Fee" and "PFC-Purchased Fuel" deductions, information pertaining to Range's use of fuel in connection with processing gas at the well sites, and records showing the extent to which Range reduced the volume of gas and NGLs sold based on certain of these deductions. ECF No. 181-2 at 13.

Ultimately, Range produced three CDs of electronic data reflecting its computation of royalty payments for every class member, for every month from March 2011, when the Original Settlement Agreement was approved, through 2018.  Class Counsel's redacted exemplar of the raw data shows that the information amounted to some 2,873 printed pages. ECF No. 180-3.  The parties have represented that this information contained approximately 12 million data points.

While discovery was proceeding, Mr. Altomare filed the Rule 60(a) Motion, wherein he claimed that the class's damages from the MCF/MMBTU discrepancy exceeded $60 million. ECF No. 107.  Range strenuously disputed this estimate and, on September 18, 2018, Range's counsel provided Mr. Altomare a spreadsheet (apparently totaling nearly 900 pages), which detailed the company's own internal calculations of the MCF/MMBTU royalties differential. ECF No. 181-5.  Range's calculations were conducted at "well-level," meaning that they approximated the percentage of the volume of production from each well subject to the PPC caps and assessed the difference between applying the MMBTU or MCF multiplier on those associated volumes.  ECF No. 181-5; ECF No. 126-1, ¶9.  Using this methodology, Range estimated that the MCF/MMBTU differential based upon production from March 2011 to April 2017 was $14,319,794.93.  ECF No. 126-1, ¶9.

Meanwhile, Mr. Altomare undertook a revision of his own damages calculation in light of the information he had received from Range.  Using the extensive raw data Range had provided, Mr. Altomare computed class damages as approaching $24 million, as reflected in his deficiency computation worksheet.  ECF No. 181-4.  After Mr. Altomare made a demand for that amount, however, Range again disputed his calculations and pointed to a number of specific accounting errors that Mr. Altomare had made, including (among other things):  incorrectly assuming that a uniform cap of $0.72 would apply to both dry *and* wet shale gas (when a $0.80 cap applied to the latter); improperly treating certain categories of coded amounts as royalty deductions rather than amounts that had been credited back to class members; improperly including *overriding* royalty interests in the damages assessment, when the Class Counsel represented only royalty interest holders; including royalty owners who were free from all deductions and were therefore not subject to the *Frederick* PPC cap; and failing to properly account for the amount of attorney fees that Range had paid in accordance with the Original Settlement.  ECF No. 181-5.

On October 22, 2018, after the case was transferred to the undersigned, Range filed a motion seeking the appointment of a mediator to assist the parties in resolving their dispute. ECF Nos. 116, 117.  Class Counsel filed a response the following day, indicating that he could not properly mediate the class's claims until he had received more information from Range relative to the computation of damages.  ECF No. 118.

Range opposed this request for additional information, arguing that it went beyond the bounds of allowable discovery as defined by Judge Bissoon's July 26, 2018 Memorandum and Order and essentially constituted a fishing expedition involving issues not raised in the Motion to Enforce.  ECF No. 126.  In a brief filed on November 2, 2018, Range noted that it had already

provided ESI relating to royalty payments for every class member since March 2011 and a detailed wellhead-level computation of MCF/MMBTU damages totaling $14,319,794.93. Citing a new affidavit from Ms. Whitten, Range now disclosed that it had undertaken a second, more time-consuming analysis of the MCF/MMBTU damages figure based upon an examination of royalties paid to each individual interest holder since 2011. Those calculations, which Range considered more accurate than the wellhead analysis, produced estimated damages in the amount of $10,127,266.00 through May of 2018. ECF No. 126 at 5 and 126-1, ¶¶ 11-13. Based on these figures, Range took the position that the class's claim for damages in the tens of millions of dollars was grossly overinflated. ECF No. 126.

In a brief filed on November 9, 2018, Mr. Altomare explained that, notwithstanding Range's disclosure of raw data, he was unable to verify Range's accounting methods without additional information pertaining to "Unit Acreage," "Owner Acreage," and "Lease Royalty [Percentages]." ECF No. 128. Mr. Altomare also wanted to know whether the figures in Range's data for sales proceeds and product volumes represented gross or net figures, which would help him ascertain how certain charges were being applied. Id. He noted that the class's outstanding discovery requests were designed to verify gross volumes of product, clarify any withholdings, and indicate the amount of proceeds realized. Id. Mr. Altomare also sought additional information to explain how Range determined its own costs for, e.g., gathering expenses (i.e. "GAI-gathering"), how Range distinguished those costs from other expenses, and whether any costs are incurred from third parties. Id. at 4. In seeking this information, Mr. Altomare advocated for discovery that would be as broad in scope as that which the class would have received if an auditor had been appointed. Id. at 6-7. Noting that the lion's share of discovery had been directed at the calculation of damages, Mr. Altomare rejected the idea that

the class "must accept, without verification, the data already provided," because this "would unreasonably restrict Plaintiffs to a calculation which simply replaces MMBTU with MCF volumes without the ability to question the underlying data."  Id. at 7.  Without further information, Mr. Altomare felt "ethically constrained to accept no proposal made in mediation" because he would essentially have "no starting point from which to negotiate."  Id.

In light of the parties' ongoing impasse, the Court held a status conference on November 13, 2018, wherein it was agreed that Range would file another brief further explaining its damages calculations.  ECF No. 129.  To that end, Range responded on December 7, 2018 with a "step-by-step methodology" explaining how it had calculated the $10,127,266 damages estimate based entirely on information taken from the previously disclosed ESI database.  ECF No. 131 at 5-7.  Range reiterated that the $10 million figure constituted its most accurate, good faith estimate of damages.  Id. at 7.  By contrast, the company's preliminary calculation based upon a wellhead analysis was a faster, but less accurate, method of estimating damages because "it only examined the percentages of production in the wells at a snap shot in time when the analysis was conducted" and "did not take into account all of the changes to the units and the wells that have occurred between 2011 and present day, including amendment of units, inclusion of additional leases or exclusion of leases, and changes in royalty ownership."  Id. at 8.  Range pointed out that the class's initial damages claim in excess of $65 million, as set forth in the Rule 60(a) Motion, was grossly inflated because, among other things, it failed to properly account for attorney fees that had been paid out of the class members' royalties (per the original settlement terms) and it improperly included volumes of gas sold from non-shale wells, which were not subject to the PPC cap.  Id. at 8-9.

Mr. Altomare represents that, upon review of the information received through discovery, he ultimately came to believe that Range's critiques of his original damages calculation were well-taken. ECF No. 181 at 5. The Court accepts Mr. Altomare's representation that, in anticipation of the mediation session that had been scheduled for January 2019, he undertook the "arduous process" of correcting his prior accounting flaws and, after doing so, arrived at a revised damages estimate of approximately $14.7 million, as set forth in his revised computation of damages. ECF No. 181 at 5; ECF No. 181-6. Mr. Altomare states that his confidence in the reasonableness of this estimate was bolstered by Ms. Whitten's affidavit, which had placed the class's royalty shortfall in the range of $10-$14 million.

Based upon the foregoing facts, the Court finds by a preponderance of evidence that discovery was sufficient for Class Counsel to assess the value of the class's claims and negotiate a settlement that provides fair compensation, notwithstanding the lack of depositions or more extensive document requests and interrogatories. In this circuit, the lack of formal discovery does not automatically render a settlement unfair. *See, e.g., In re NFL Players concussion Injury Litig.*, 821 F.3d at 436 (concluding that district court did not abuse its discretion in finding class counsels' informal discovery to be sufficient). The posture of this case is unusual in that the present phase of these proceedings is an extension of prior litigation involving parties who have had an ongoing relationship and continuing dialogue about various disputed issues. Thus, notwithstanding a fairly intensive four-month period of formal discovery, the exchange of information was not limited to formal requests for documents and interrogatories; it also involved informal back-and-forth communications between counsel and their respective agents as issues arose and the parties worked through their respective disagreements.[9]

---

[9] In fact, the record shows that this dialogue was ongoing even before Class Counsel filed the Motion to Enforce, as various issues were hashed out between Mr. Altomare and Range's

During the four-month period of formal discovery, Class Counsel served multiple requests for documents and received voluminous electronic data from Range Resources, as well as a detailed accounting of Range's own damages calculations, which Mr. Altomare was able to cross-check against his own computations. Substantively, discovery occurred on a granular level as counsel delved into the minutiae of arcane and highly technical accounting issues. Along the way, Range essentially made full disclosure of its accounting methodologies, as well as its underlying source data. Range's attorneys also permitted Mr. Altomare to speak directly to Ms. Whitten so that the parties could work toward a common understanding of the shortfalls that had resulted from the MCF/MMBTU differential. ECF No. 181-5, ECF No. 126-1, ¶10. Through the exchange of information, the parties were able to arrive at a narrower and, presumably, more accurate range of estimated class damages relative to that particular claim.

Although the Bigley Objectors have criticized Mr. Altomare for relying on Range's own computation figures, the Court accepts Mr. Altomare's explanation that he felt confident about the reliability of Ms. Whitten's computations, both because (a) her statements had been offered in the form of a sworn affidavit, made under penalty of perjury, *see* ECF No. 144-1, and, (b) Mr. Altomare and Ms. Whitten "had a long history of amicably dealing with innumerable incidental issues arising out of Range's implementation of the original settlement since its inception in 2011," and "[i]n dealing with those issues Ms. Whitten has always dealt fairly with counsel in correcting and reimbursing individual class members for errors in Range's administration of the settlement." ECF No. 181 at 6. Mr. Altomare's assessment of Ms. Whitten's reliability and willingness to work with class members to resolve their individualized complaints comports with the Court's own assessment, after hearing from the witnesses at the fairness hearing. Besides

---

agents on an *ad hoc* basis, often with the input of Mr. Rupert. *See* ECF No. 171-6; Hrg. Tr. 79, 81-82, 99-100; ECF No. 160-1, ¶¶8-9.

having an opportunity to observe Ms. Whitten directly in her capacity as a witness, the Court notes Mr. Rupert's acknowledgement that he had also communicated directly with Ms. Whitten on occasion to amicably resolve certain issues or disputes concerning the class members' royalty payments.  Hrg. Tr. at 82:2-12.

The objectors contend that discovery was insufficient because, in their view, Mr. Altomare did not adequately investigate the other claims in the Motion to Enforce, apart from the MCF/MMBTU issue.  This objection is not well-taken.  To begin, it is apparent that both Mr. Altomare and Range's attorneys considered the MCF/MMBTU issue to be the primary component of class-wide damages.  *See, e.g.,* ECF No. 131 at 1 (describing the MMBTU v. MCF differential as the "issue that all parties agree is the crux of the dispute").  This was logical inasmuch as the MCF/MMBTU differential was an issue that could be cogently litigated on a class-wide basis, it had arguable merit, and it involved a seven-year period of allegedly deficient royalty payments.  Therefore, it was reasonable for Class Counsel to focus his discovery efforts on that particular claim, as it was an obvious and substantial source of class-wide damages.  In any event, however, the record reflects that Mr. Altomare *did* pursue discovery relative to the other claims in the Motion to Enforce, as is shown by his requests for production of documents and interrogatories, *see* ECF No. 181-2 at 13-22, and the parties' motions practice, *see* ECF No. 126 at 6 (Range brief acknowledging that Mr. Altomare requested information apart from the MCF/MMBTU issue "relating to other deductions [that were] purportedly improperly taken by Range").  As noted, discovery also occurred on an informal basis through Class Counsel's ongoing exchange of information with Range's agents and lawyers. The record reflects that Mr. Altomare investigated the merits of the other (non-MCF/MMBTU) claims in the Motion to

Enforce but, for reasons discussed at more length herein, he ultimately concluded that they lacked merit or were otherwise not worth litigating.

Based upon the foregoing reasons, the Court finds that Class Counsel engaged in sufficient discovery for purposes of assessing the merit and value of the class's claims and negotiating a fair and reasonable settlement.

### 4.   Negotiations Occurred at Arms' Length.

The Court also finds that negotiation of the Supplemental Settlement occurred at arms' length.  As noted, the attorneys for the settling parties are knowledgeable and experienced litigators in the area of oil and gas law.  There is no evidence of collusion between Mr. Altomare and the defense attorneys who negotiated the terms of settlement.  On the contrary, the record in this case demonstrates that Mr. Altomare assumed an appropriately adversarial posture vis-a-vis Range's counsel throughout this most recent phase of litigation.

 Having presided over the parties' discovery motions practice, the undersigned was able to observe counsels' interactions first-hand.  The Court finds that, while the attorneys were at all times professional in their demeanor, they also acted as zealous advocates for their respective clients.  As noted, Class Counsel initially sought the appointment of an auditor in his Motion to Enforce the Original Settlement Agreement.  After that request was denied by the Court, Mr. Altomare advocated for a scope of discovery that would be as broad as a court-ordered audit. ECF No. 94; ECF No. 128 at 6-7.  Although Range disclosed a vast amount of raw data in support of its royalty shortfall calculations, Mr. Altomare would not commit to formal mediation until he felt comfortable that he understood Range's accounting methodology and the data points underlying Range's estimates.

Any doubts about Class Counsel's zealousness are further allayed by the fact that both the Motion to Enforce and the Class's Rule 60(a) motion included a request that Range be sanctioned for its conduct toward the class.  ECF No. 93; ECF No. 107 at 13-15.  And, during discovery when Mr. Altomare felt that Range was not being sufficiently forthcoming with its responses, Mr. Altomare indicated that he was prepared to file a motion to compel answers as well as another request for sanctions.  ECF No. 118-1 at 5.

Notably, even after Mr. Altomare recalculated class damages and concluded that $14.7 million was a more reliable estimate, he did not move from his original $24 million demand for purposes of the January 2019 mediation.  Those proceedings resulted in the $12 million common fund for the class and an agreement to prospectively amend the original Order Amending Leases to correct the prior MCF/MMBTU discrepancy.  These terms were achieved through the involvement of former Judge Frampton, a skilled and experienced mediator who is well versed in issues pertaining to oil and gas law.

Based upon the foregoing facts, the Court concludes that the settlement negotiations in this case occurred at arms' length by attorneys who are experienced litigators in the field of oil and gas law.  The Court has also found that Mr. Altomare obtained sufficient discovery for purposes of assessing the class's claims and evaluating the fairness of the settlement terms.  And, as noted, only a very small percentage of the class has lodged objections.  Consequently, the Court finds by a preponderance of evidence that a presumption of fairness should be accorded to the proposed Supplemental Settlement.

### Rule 23(e)(2) Criteria

Irrespective of whether a presumption of fairness is appropriate in this case, the Court finds that the factors listed in Federal Rule 23(e)(2) also favor approval of the Supplemental Settlement.  We consider them in turn.

A. <u>Adequacy of Class Representation</u>

Under Rule 23(e)(2)(A), the Court must consider whether the class representatives and class counsel have adequately represented the class.  The concern here is the procedural fairness of the litigation and settlement process.  *See* Fed. R. Civ. P. 23, Advisory Committee Notes to 2018 Amendments (noting that subsections 23(e)(2)(A) and (B) "identify matters that might be described as 'procedural' concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement").  "[T]he focus at this point is on the actual performance of counsel acting on behalf of the class."  *Id.*  Factors such as "the nature and amount of discovery . . . may indicate whether counsel negotiating on behalf of the class had an adequate information base."  *Id.*

No challenges have been raised concerning the adequacy of the named Plaintiffs as class representatives, but the objectors have vigorously challenged the adequacy of Mr. Altomare's representation in his capacity as Class Counsel.  In fact, the Bigley Objectors insist that Mr. Altomare's removal is necessary because his interests have significantly deviated from those of the class such that he can no longer adequately represent their interests.  The objectors principally focus upon three aspects of Mr. Altomare's representation:  (i) his failure to pursue the MCF/MMBTU issue after first becoming aware of it in 2013, (ii) his conduct as it relates to pursuing class discovery and negotiating the Supplemental Settlement, and (iii) his submission of materially inaccurate billing records in connection with his present fee application.

Concerning the first point, it is undisputed that Mr. Altomare became aware of the MCF/MMBTU discrepancy in Judge McLaughlin's Order Amending Leases at least by July 2013. Also undisputed is the fact that Mr. Altomare did not bring the issue to the Court's attention in 2013; instead, he waited 4 and ½ years before filing the Motion to Enforce the Original Settlement Agreement and, subsequently, the Rule 60(a) motion to correct the Order Amending Leases. The Court agrees with the Bigley Objectors that, in this regard, Mr. Altomare's conduct initially placed the class at a disadvantage in terms of attempting to achieve the full benefit of their original settlement. His delay not only extended the duration of Range's alleged underpayments but also gave rise to Range's colorable defense that the class's MCF/MMBTU claim was time-barred.[10]

Range contends that Mr. Altomare's delay in pursuing the MCF/MMBTU issue is of limited relevance in terms of judging the ultimate fairness and adequacy of the Supplemental Settlement because, in weighing the value of the proposed settlement against the prospect of continued litigation, the Court must consider the legal landscape as it presently exists for the Class. This is true from a substantive standpoint. From a procedural standpoint, however, Mr. Altomare's delay is relevant to the extent it informs whether Class Counsel was operating under a potential conflict of interest that tainted the integrity of the litigation and settlement process. "Where a court fears counsel is conflicted, it should subject the settlement to increased scrutiny." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d at 331.

On that point, the objectors maintain that Mr. Altomare was conflicted in that he was incentivized to rush into an inadequate settlement in an effort to remedy his past mistake. They

---

[10] As discussed at greater length herein, this consideration strongly informs the Court's determination of a proper fee award and is a major factor justifying the Court's refusal to grant Class Counsel his requested fee.

insist that the Supplemental Settlement fails to account for other substantial areas of underpayment, which they feel were not sufficiently investigated.

In the Court's view, this is not what the record bears out.  In both the Motion to Enforce and the Rule 60(a) Motion, Mr. Altomare vigorously argued the class's claims.  After unsuccessfully requesting a court-appointed auditor, he advocated for a broad scope of discovery and obtained voluminous electronic data relative to Range's royalty payments for every class member over a seven-year period. When Range moved the Court to order mediation, Mr. Altomare successfully opposed Range's motion and obtained additional discovery concerning Range's accounting methodology and computations so that he could intelligently cross-check Range's damages estimate against his own calculations.  Throughout the litigation phase Class Counsel maintained an appropriately adversarial posture toward Range and sought or threatened to seek sanctions on numerous occasions.  To the extent heightened scrutiny of the Supplemental Settlement is warranted, the Court is satisfied that Class Counsel ultimately obtained sufficient formal and informal discovery to fairly evaluate the strengths and weaknesses of the claims asserted in the Motion to Enforce.  In this respect, Mr. Altomare's interests remained sufficiently aligned with those of the class.

The Objectors have also suggested that Class Counsel was inadequate in that he lacked an understanding of some of the basic issues in this case. They cite, for example, Mr. Altomare's apparent unawareness that Range reported both MMBTU and MCF figures on its statements. See Tr. at 121-122.  Elsewhere, they note that Mr. Altomare initially misapplied the PPC cap applicable to wet shale gas when computing class damages.  ECF No. 181-5.   The Bigley objectors also assert that Mr. Rupert informed Class Counsel in August 2017 that Range was

failing to apply the PPC cap altogether in certain cases, but Mr. Altomare failed to follow up on this issue in discovery.

Once again, the objections are not well-taken.  The cited exchange in the transcript concerning Range's royalty statements involves an anecdotal point with little probative value when viewed in the context of the entire record.  Mr. Altomare's initial misapplication of the wet shale PPC cap was a computational oversight that was cured in the normal course of informal discovery.  Mr. Rupert's reports about Range's failure to apply the PPC cap appears to have involved discrete accounting discrepancies rather than a systemic, class-wide breach. Accordingly, whether considered individually or collectively, the objectors' proffers do not change the Court's conclusion that, on balance, Mr. Altomare provided adequate representation to the class.

More disconcerting is the Bigley Objectors' suggestion that Class Counsel submitted fraudulent time sheets in support of his fee application.  This issue originated with Mr. Rupert's observation that many of the billing entries that Mr. Altomare had initially submitted in support of his fee application appeared to mirror Mr. Rupert's own time entries, which Mr. Rupert had forwarded to Mr. Altomare for the purpose of seeking reimbursement from the common settlement fund.  See ECF No. 160-1.  Based on Mr. Rupert's testimony that he first contacted Class Counsel in 2014, the Bigley Objectors argue that Mr. Altomare fraudulently submitted "countless hours of time at the rate of $495 per hour beginning in 2012 for consultations with Mr. Rupert that never occurred."  ECF No. 180 at 11.  In addition, the Bigley Objectors cite Mr. Rupert's testimony that he only consulted with Mr. Altomare concerning 7 of Mr. Rupert's 39 class-member clients; thus, the Bigley objectors assert that Mr. Altomare falsely billed for non-existent consultations relative to 32 of Mr. Rupert's clients.  The Aten Objectors similarly posit

that the Court "should critically review Class Counsel's judgment and assurances because of the serious issues associated with Class Counsel's submissions of the time entries associated with this matter." ECF No. 178 at 12.

In response, Mr. Altomare states that he did not misappropriate Mr. Rupert's billing entries but, rather, used them as a source to reconstruct his own time records in support of his fee application. ECF No. 171 at 9-11, ECF No. 181 at 8-11. Mr. Altomare acknowledges that he failed to maintain contemporaneous records of his various consultations with Mr. Rupert, in contravention of the local rules of this Court. ECF No. 171 at 10, n.2. In an attempt to retroactively reconstruct those time entries, Mr. Altomare claims that he used Mr. Rupert's time entries as a reference point for presumed consultation dates, billing 30 minutes for each presumptive consultation with Mr. Rupert. ECF No. 171 at 9-11, ECF No. 181 at 8-11. As proof that he did not simply appropriate Mr. Rupert's entries, Mr. Altomare notes that his own records reflect an average of 3 consulting hours per month, whereas Mr. Rupert billed an average of 15 hours per month for the same clients. ECF No. 190 at 8; ECF No. 171 at 10. Mr. Altomare further states that, while he originally intended to submit Mr. Rupert's billing records to the Court as part of a request for reimbursement of expenses, it would have been improper for him to do so because the Class notice did not include an allowance for Mr. Rupert's fees. Accordingly, Mr. Altomare attests that he intends to honor Mr. Rupert's request for reimbursement but must do so by paying Mr. Rupert out of his own attorney fee award. ECF No. 171 at 11 n.4.

The Court accepts Mr. Altomare's representations in this regard as truthful based on the fact that Mr. Altomare is an officer of the Court, has no professional disciplinary record to the Court's knowledge, and has sworn to the truth of his representations under penalty of perjury.

ECF No. 181-7.  In addition, Mr. Altomare's representations comport with the expanded billing records and metadata that he has supplied in his responsive brief.  ECF No. 171-3; ECF No. 181-9.  Accordingly, the Court does not attribute any fraudulent motive to Mr. Altomare vis-a-vis the challenged billing records.

Even so, Mr. Altomare's billing entries contain many material inaccuracies, which significantly impairs their reliability and utility.  As matters stand, Counsel's time entries include many purported consultations with Mr. Rupert during the years 2012 and 2013 which could not have occurred because of the fact that Mr. Rupert apparently had no professional relationship with Mr. Altomare prior to April of 2014.  Hrg. Tr. at 105-106.  The Court also credits Mr. Rupert's testimony that he consulted with Mr. Altomare on only 7 out of his 39 class member clients that are represented in Mr. Altomare's billing records; thus, Mr. Altomare inaccurately constructed billing time for consultations that never occurred relative to 32 of Mr. Rupert's clients.  Hrg. Tr. at 106-107.  In addition, Mr. Altomare's time records appear to include at least one purported consultation concerning a client of Mr. Rupert's who is not a class member.  Id. at 104.

Ultimately, the Court is inclined to view Mr. Altomare's actions as a hasty and ill-advised attempt to reconstruct what he believed was a fair representation of the amount of overall time spent in professional consultations with Mr. Rupert.  While the Court does not find that Mr. Altomare acted in bad faith or with intent to deceive the Court into awarding unearned fees, Mr. Altomare plainly should have disclosed to the Court his lack of contemporaneous billing records and the methodology he employed to generate an estimation of his services.  As discussed below, these considerations significantly inform the Court's analysis of Class Counsel's fee application.

However, they do not alter the Court's conclusion that Mr. Altomare adequately investigated, litigated and negotiated the claims asserted in Motion to Enforce and the Rule 60(a) motion.

On balance, and giving due consideration to the objections that have been raised about Class Counsel's performance in this case, the Court finds that the representative Plaintiffs and Class Counsel have adequately represented the class in terms of litigating the class's claims and negotiating the proposed Supplemental Settlement.  This finding favors approval of the settlement.

B. <u>Arms' Length Negotiation</u>

Rule 23(e)(2)(B) requires the Court to consider whether the settlement proposal was negotiated at arms' length.  For the reasons previously discussed, the Court finds that the Supplemental Settlement was the product of arms' length negotiation by experienced counsel, who enlisted the assistance of an experienced neutral mediator.  This factor favors approval of the settlement.

C. <u>Adequacy of the Relief Provided</u>

The Court next considers whether the relief provided for the class is adequate, taking into account:  (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).  With the exception of the proposed award of counsel fees, which the Court in its discretion can remedy, these considerations strongly favor approval of the Supplemental Settlement.

(i)

46

First, the Court finds that the proposed Supplemental Settlement is reasonable and adequate in light of potential costs, risks, and delay that the class would otherwise incur if litigation continued.  If approved, the Supplemental Settlement will prospectively cure the discrepancy in the Order Amending Leases relative to the shale gas PPC cap by clarifying that, henceforth, the cap will be calculated on an MCF basis.  The Supplemental Settlement will also provide a substantial lump sum payment of $12 million as compensation for past royalty shortfalls.  The Court finds that this is a substantial benefit to the class and arguably provides complete relief for the royalty shortfalls that resulted from Range's past computations based upon MMBTUs.

The disputed matters in this case concern complex accounting issues as applied to a highly technical aspect of oil and gas law, and further litigation of the case will likely be costly.  The objectors have suggested that more discovery is needed in order to properly prosecute the class claims, including depositions to test the sufficiency of Range's prior disclosures.  This, of course, will result in significant expense.  And even if a full analysis and computation of additional class-wide damages could be conducted solely on the basis of the electronic data that Mr. Altomare has already obtained, this would still be an expensive and time-consuming undertaking, given the size of the class and the number of payment months at issue.

In terms of delay, the Court notes that the disputes at issue in the proposed Supplemental Settlement date back to events that started in 2011.  This more recent phase of litigation had already lasted two years before further delays occurred owing partly to the Covid-19 pandemic.  If the Supplemental Settlement is rejected, compensation for the vast majority of class members who have not lodged objections will, at the very least, be further delayed pending final resolution

of the Motion to Enforce, Resolution of the Class's Rule 60(a) Motion, and likely, an appeal process.

In addition, further litigation would entail substantial risks to the class in terms of establishing liability.  If the Supplemental Settlement is rejected, Range will, of course, reassert the defenses it previously raised in relation to the Motion to Enforce the Original Settlement Agreement and the class's Rule 60(a) Motion.  Heretofore, the primary issue relative to royalties has been the underpayments attributable to the MCF/MMBTU differential.  To the extent this claim is framed as a breach of the Original Settlement Agreement, Range has a colorable statute of limitations defense that may well bar any recovery for royalty shortfalls occurring before January 2014.  To the extent the claim is pursued under Rule 60(a), Range has other credible defenses.  Range has argued, for example, that the motion is more properly analyzed under Rule 60(b), rather than Rule 60(a), and is untimely under that provision.  If Range prevailed on its defenses, the class would obtain no relief – either retroactively or prospectively – relative to their claims based upon the MCF/MMBTU differential.  And even if the motion were considered to be timely, Range has colorably argued that any retrospective relief would be unfair, since Range fully complied with the terms of the Court's Order for seven years.  Even if the class prevails in the District Court, it is likely that Range will appeal any adverse judgment, which presents the risk that the underlying judgment could be overturned.

Insofar as the objectors would seek to litigate the other claims in the Motion to Enforce, there is a substantial risk that the costs of litigation may outweigh any potential recovery.  Range has asserted a number of defenses to those claims, which Mr. Altomare assessed to be meritorious or otherwise not worth litigating.  As to "PFC-Purchased Fuel" charges, Range acknowledged that it had, for a one-month period, inadvertently failed to include this deduction

in its calculation of the PPC Cap; but Range also represented that it had long ago corrected the mistake and credited those overcharges back to the class members.  ECF No. 101 at 14-15; ECF No. 171 at 8.  With respect to the "PHI-Proc Fee" charge, Range argued that the fee was being properly deducted in accordance with the terms of the Original Settlement Agreement governing NGLs, but not in a duplicative fashion. ECF No. 101 at 14.  With respect to the "TAI-Transport" deductions, Range argued that the class had misunderstood the charge as a cost deducted from the NGL royalty when, in fact it is an unaffiliated third party charge related to the transportation of natural gas, which was being properly deducted.  ECF No. 101 at 13.  As to the allegation that Range had failed to apply the PPC cap at all, Range took the position that this was only true as to "FCI-Firm Capacity" charges, and only for a close-ended one-year period.  ECF No.  184, ¶10.  If the class were to fully litigate these claims, it would surely incur greater expense, but without any guarantee of a more favorable recovery than is presently offered under the Supplemental Settlement.

In sum, the attendant costs, risks and delay that the Class would incur if litigation continues all weigh in favor of accepting the Supplemental Settlement.

(ii)

Next, the Court considers "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."  Fed. R. Civ. P. 23(e)(2)(C)(ii).  Here, the proposed relief consists of two components.  First, the Supplemental Settlement would provide prospective relief through the amendment of class members' leases to correct the MCF/MMBTU discrepancy.  Range would effectuate the recordation of the Court's Order effectuating the lease amendments.  This places no burden on class members and is

administratively feasible, as demonstrated by Range's prior recordation of the original Order Amending Leases.

The Supplemental Settlement also provides retrospective monetary relief.  Specifically, after payment of attorney fees, the net settlement fund will be distributed on a *pro rata* basis to class members who have been paid at any time since the original settlement for shale gas that was produced by Range pursuant to leases that are subject to this litigation.  ECF No. 135-1, ¶2. *Pro rata* payments will be computed based on the total MCF volume of each class member's gas, dating from the March 2011 production period through the production period in which the Supplemental Settlement Agreement is approved by the Court. *Id*. [11]  The relevant MCF volumes will be derived from Range's revenue payment history files.  *Id*.  The Supplemental Settlement does not anticipate any claims procedure because Range will automatically compute and send the supplemental settlement payments to class members upon final approval of the settlement and final disposition of any appeal therefrom.  *Id*.  Again, no burden is placed on class members.

Based upon the foregoing, the Court finds that the proposed methods for providing prospective relief and for processing and distributing monetary relief to class members are effective, fair, adequate, and reasonable.  This favors approval of the Supplemental Settlement.

(iii)

The Court next considers the adequacy of the relief to the class in light of the proposed award of attorney's fees and the timing of payment. Fed. R. Civ. P. 23(e)(2)(C)(iii).  Strictly speaking, the Supplemental Settlement Agreement does not call for any particular fee award and

---

[11] In addition, Range has agreed to pay each class member the amount of any MMBTU-related shortfall for the time period January 2019 (when settlement terms were reached) through the time that settlement checks are finally mailed to each class member.  See ECF No. 135-1 at 4, ¶2(a)(v).  Thus, class members will not be prejudiced by any past or future delays resulting from the briefing of the instant motions, the period that the motions were under advisement with this Court, or the period during which the pending motions may be litigated before the Court of Appeals.

merely states that attorney fees and expenses will be awarded from the $12 million fund.  As is set forth in the fee application, however, Class Counsel has requested an award of twenty percent (20%) of the common fund, or $2.4 million, plus twenty percent (20%) of the increased royalties that will result from the prospective use of an MCF multiplier in calculating the PPC cap for shale gas over the next ten years.  For reasons that are discussed in more detail below, the Court considers this requested fee excessive under the unique circumstances of this case; however, the Court also has the discretion to adjust the fee award to a more appropriate figure.  *See In re Baby Prods. Litig.,* 708 F.3d at 182 (confirming that a district court "may, in its discretion, reduce attorneys' fees based on the level of direct benefit provided to the class").

For reasons explained in more detail below, the Court finds that Mr. Altomare's fee award in this case should be limited to $360,000, leaving $11,640,000 available for distribution to class members.  The Court is comfortable that a class recovery in the amount of $11,640,000 is fair, reasonable, and adequate under all of the circumstances of this case.  In light of this adjustment, the attorney fee award will not otherwise impair the reasonableness and adequacy of the settlement.

The timing of payment to class members is also adequate.  Pursuant to the Supplemental Settlement Agreement, Range will pay Class Counsel any court-approved fees within fifteen (15) days after the following the "Final Disposition Date," which is defined as the date on which the U.S. Court of Appeals for the Third Circuit either affirms the undersigned's order approving the Supplemental Settlement or dismisses all appeals therefrom.   See ECF No. 135-1, ¶3; id. at ¶2(a)(ii).  Class members are to be paid within ninety (90) days after the "Final Disposition Date."  Id. at ¶2(a)(ii).  The Court finds that this timetable for payment is reasonably expeditious and supports the adequacy of the relief afforded under the Supplemental Settlement.

(iv)

Next, the Court considers the adequacy of the proposed relief in light of "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, the primary objections to the Supplemental Settlement Agreement center around the release provision and the objectors' argument that the agreement is unsupported by consideration.

The release provision at issue is broad and requires class members to forego, in essence, any claim that could conceivably have been asserted as of the date of the Court's approval of the Supplemental Settlement Agreement, to the extent such claims "aris[e] out of the facts giving rise to the Motion to Enforce." ECF No. 135-1, ¶4. The Aten Objectors point out that the motion to enforce raised seven other alleged breaches of the Original Settlement Agreement, aside from the MCF/MMBTU disparity. They maintain that the Supplemental Settlement does not deliver any tangible benefit to the Class on the other issues that would be forever waived by virtue of the release provision. Stated differently, the Aten Objectors contend that the Supplement Settlement is unsupported by consideration. They posit that the release should be limited to only the MCF/MMBTU claim, leaving class members free to sue Range on the other claims that were -- or could have been -- raised in the Motion to Enforce.

As Range points out, however, these objectors misconstrue the nature of the consideration that Range is providing. The $12 million settlement payment is not strictly attributable to one claim under the terms of the Settlement Agreement, but is rather a lump sum that Range is willing to pay in order to buy peace and obtain a release of all potential claims. And, in addition to making the settlement payment, Range is foregoing potential defenses that might substantially reduce or even eliminate its exposure to damages in this case. For these reasons, the Supplemental Settlement Agreement is supported by adequate consideration and

does not constitute an inadequate, unfair, or unreasonable resolution of the Class's claims.  In any event, the Court is not empowered to change the provisions of the Settlement Agreement so as to narrow the scope of the release language.  *See Ehrheart*, 609 F.3d at 593 ("A district court is not a party to the settlement [of a class action], nor may it modify the terms of a voluntary settlement agreement between the parties.").

     D.  <u>Equitable Treatment of Class Members</u>

     Rule 23(e)(2)(D) requires that the Court consider whether the proposed Supplemental Settlement treats class members equitably relative to each other.  The Court is satisfied that it does.

     As discussed, the primary claim in the class's Motion to Enforce concerned Range's alleged underpayment of shale gas royalties, which resulted from Range's use of the MMBTU metric set forth in the March 17, 2011 Order Amending Leases. The Motion to Enforce also included other claims for monetary relief that concerned royalties associated with shale gas production.  The Supplemental Settlement therefore provides for a cash payment to class members who previously received allegedly deficient royalty payments associated with shale gas production.  Settlement payments are designed to occur on a *pro rata* basis, such that the amount of compensation will presumably correlate to each class members' estimated loss.

     The settlement also contemplates a revision of the Order Amending Leases that will prospectively utilize MCFs in applying shale gas PPC caps, and this prospective change will apply to all class members' leases, irrespective of whether those leases are associated with past shale gas production.   This is appropriate inasmuch as oil and gas development is not static and, as Range explains, a lease that is currently associated only with conventional oil and gas development may be associated at a later point with shale gas development.  ECF No. 198 at 3.

Because of the non-static nature of oil and gas development, every class member's lease was amended in 2011 to include all of the terms set forth in the Order Amending Leases.  Under the terms of the Supplemental Settlement, all class members' leases will similarly be amended to include the MCF measurement for PPC caps associated with shale gas production. The amendment will benefit all class members regardless of the state or type of development that is currently associated with a particular lease, due to the possibility that any class member's lease may be subject to shale gas production in the future.  In this way, the anticipated revision to the Order Amending Leases keeps the interests of the class aligned, because class members who have an interest in shale gas wells either now or in the future will be subject to the same caps on certain PPCs.

The Aten Objectors argue that the Supplemental Settlement fails to deliver a uniform benefit and essentially picks "winners" and "losers" in that the revised Order Amending Leases would only apply to those leases in which Range still held the lessee's interest as of January 2019.  ECF No. 161 at 13.  If a class member is party to a lease that Range transferred to another operator at some point prior to January 2019, the revised Order Amending Leases (and the future benefits therefrom) would not apply to such lease.  Thus, the objectors argue, the Supplemental Settlement would create two species of subclasses, one whose members would benefit from an amended post-production cost "cap" and another whose members would not.  *Id.*

While the Court acknowledges this reality, the Court does not view it as fatal to approval of the proposed settlement.  As Range points out, the original class, as certified by Judge McLaughlin, contained "subsets" under which class members with non-shale wells, members with dry shale wells, and members with wet shale wells are all treated differently.  Moreover, there is seemingly no way around this conundrum, as Range no longer owns an interest in certain

properties subject to transferred leases, and it cannot settle claims that relate to interests it no longer owns.  In any event, however, it does not appear that any of the named objectors fall into this category of so-called "losing" class members.  Thus, none of the "losing" class members have objected, despite being sent notices of the Supplemental Settlement.  The Court finds that, on balance, the proposed Supplemental Settlement treats class members equitably relative to each other.

### E.  The Rule 23(e)(2) Criteria Support Approval of the Settlement

In summary, the Court's assessment of the Rule 23(e)(2) factors supports a finding that the Supplemental Settlement is fair, reasonable and adequate.  Based upon a preponderance of the evidence, the Court finds that Class Counsel adequately represented the Class in investigating, litigating and settling the class's claims, the proposal was negotiated at arms' length, the relief is adequate in light of the considerations listed in Rule 23(e)(2)(C)(i) - (iv), and the settlement terms treat class members equitably under all the circumstances.  These considerations weigh in favor of approving the settlement terms.

### *"Girsh" Factors*

As previously noted, courts within this circuit are required to address the nine *Girsh* factors in assessing the fairness and reasonableness of a proposed class settlement.  These include: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best

possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.  *See Girsh*, 521 F.2d at 157.

Many of these factors have been addressed in the Court's analysis thus far; extensive commentary is therefore unnecessary.  As the Court has observed, the litigation concerns complex issues related to the calculation of royalties under oil and gas leases.  The damages in this case stem from royalty shortfalls dating back to 2011.  Litigation of the current class claims began in January 2018, and the duration of additional discovery and litigation could easily last another two years, given the strong likelihood that any future judgment would engender an appeal.  Additional discovery and litigation is also likely to be costly, given the specialized accounting matters at issue, the number of years in question, and the size of the class.  Thus, the complexity, expense, and likely duration of further litigation are factors that weight in favor of approving the Supplemental Settlement.

In terms of class reaction, less than one percent of the class members have objected to the Supplemental Settlement, which affords both retroactive and prospective relief.  This too counsels in favor of approving the class settlement.

The stage of the proceedings and the amount of discovery have already been discussed at length.  As noted, settlement was reached in this case only after an intensive four-month period of discovery, which included the attorneys' extensive informal discussions, formal document discovery, and motions practice.  That process has yielded voluminous electronic data relative to the class's claims, as well as Range's disclosure of its detailed damages calculations and accounting methodologies.  Despite the lack of depositions or additional formal discovery, the Court is satisfied that Class Counsel had sufficient information to intelligently assess the

strengths and weaknesses of the class's claims. This consideration supports a finding that the settlement is fair and adequate.

The risks to the class of establishing liability and damages are factors that also support the settlement.  To the extent the class claimed that Range had breached the original Settlement Agreement by calculating royalties on an MMBTU basis, Range could credibly argue that it had merely complied with the terms of the Court's March 17, 2011 Order Amending Leases.  Insofar as the Class sought to recoup its shortfalls under Federal Rule of Civil Procedure 60, Range had a plausible argument that relief could only be sought under Rule 60(b) because the Order Amending Leases affected the substantive rights of class members and because resolving the MCF/MMBTU discrepancy would require evidence outside of the record.  ECF No. 113.  If Range were to prevail on this argument, it would have a strong argument that the Class's motion for relief was untimely.  *Id.*  And even if the Court were to determine that the motion was properly and timely asserted under Rule 60(a), Range could plausibly argue that it would be inequitable for Range to be required to pay seven years' worth of back-damages.  *Id.*

The class also faced risks in terms of establishing Range's liability on the other claims in the Motion to Enforce.  With respect to the "PFC-Purchased Fuel" claim, Range has acknowledged that it had inadvertently failed during one particular month to include these deductions in its calculation of the PPC Cap; however, Range also claimed that this mistake was long ago corrected and the overcharges were credited back to the class.  Mr. Altomare believed this defense to be meritorious.  ECF No. 101 at 14-15; ECF No. 171 at 8; ECF 190 at 12.  With respect to the "PHI-Proc Fee" claim, Range argued that this fee was being properly deducted in a non-redundant fashion in accordance with the terms of the Original Settlement Agreement governing NGLs; Mr. Altomare did not consider this claim strong enough to litigate and, in fact,

Mr. Ryan appears to concede that Range can deduct processing charges from royalties associated with NGLs. *See* ECF No. 101 at 14; ECF No. 171 at 9; ECF No. 190 at 11-12; Hrg. Tr. at 98-99; ECF No. 180 at 16.  With respect to the class's claim based on "TAI-Transport" deductions, Range argued that the class had misinterpreted a charge on Range's statements as a cost deducted from the NGL royalty when, in fact, it was an unaffiliated third-party charge related to the transportation of natural gas that was being properly deducted; Mr. Altomare came to view Range's defense on this issue as meritorious.  ECF No. 101 at 13; ECF No. 171 at 8.  With respect to costs attributable to the transportation of NGLs, Range took the position that it was entitled to deduct these costs without regard to the PPC cap due to a distinction in the Original Settlement Agreement between NGLs and gas.  ECF No. 190 at 11-12.  After reviewing the language in Article III, Paragraphs (B) and (C) of the Original Settlement Agreement, Mr. Altomare came to believe that Range's position had merit.  *Id*.  As to the allegation that Range had sometimes failed to apply the PPC cap at all, Range took the position that this was only true as to "FCI-Firm Capacity" charges, and only for a close-ended one-year period.  ECF No. 184, ¶10; ECF No. 190 at 13.  To the extent the Bigley Objectors dispute this point, they have offered no competent proof to the contrary.  Mr. Altomare viewed this circumscribed claim as an "ideal bargaining chip" for purposes of settlement negotiations. ECF No. 190 at 13.  Continued litigation of the foregoing claims would surely involve greater expense for the class but without any guarantee of a more favorable recovery than is presently offered under the terms of the Supplemental Settlement Agreement.

The sixth *Girsh* factor considers the risks of maintaining the class action through the trial. The parties have not focused their attention on this issue but, to the extent that Mr. Rupert has identified discrete instances where he perceived that certain clients had been overcharged based

upon a review of their statements, there is some danger that prosecution of these alleged breaches would devolve into a series of mini-trials that contravene the requirements of Rule 23(b)(3). That concern weighs in favor of approving the proposed Supplemental Settlement.

The seventh *Girsh* factor addresses the ability of the defendant to withstand a greater judgment. Here, there is no concern about the ability of Range Resources to sustain a judgment that exceeds the amount of the Supplemental Settlement. Accordingly, this consideration does not weigh in favor of approving the settlement, but it also does not materially affect the Court's analysis.

The eighth and ninth *Girsh* factors address the range of reasonableness of the settlement fund in light of the best possible recovery and all attendant litigation risks. Here again, the Court finds that these factors support the fairness and adequacy of the settlement.

As noted, the class's claim predicated on MMBTU-related shortfalls was the main focus of post-January 2018 litigation and the most obvious source of potential class-wide damages. Under the Supplemental Settlement, Range agrees to utilize the MCF measurement moving forward and will also pay $12 million toward past royalty shortfalls.[12]  With respect to the MCF/MMBTU claim, Mr. Altomare's last best estimate of damages was approximately $14.7 million. ECF No. 181-6. Range had calculated damages using two different methodologies and placed the shortfall in the range of $10-$14 million; however, Range had a plausible basis for arguing that $10,127,266 was the more accurate estimation, because it was predicated on a detailed analysis of royalties paid to each interest holder and accounted for certain variables that

---

[12] In addition, Range has agreed to pay each class member the amount of any MMBTU-related shortfall for the time period January 2019 (when settlement terms were reached) through the time that settlement checks are finally mailed to each class member.  See ECF No. 135-1 at 4, §2(a)(v).  Thus, class members will not be prejudiced by any past or future delays resulting from the briefing of the instant motions, the period that the motions were under advisement with this Court, or the period during which the pending motions may be litigated before the Court of Appeals.

the $14 million figure did not take into account.  Viewed in this light, the $12 million settlement fund is an eminently fair recovery.  Although the $12 million settlement fund is not strictly attributable to the MCF/MMBTU claim alone, that amount substantially meets, and potentially exceeds, the amount of class-wide damages stemming from the MCF/MMBTU shortfall.  The proposed Supplemental Settlement is all the more reasonable in light of Range's colorable bases for contesting its liability on the various class claims.

The objectors contend that the Supplemental Settlement presents a windfall for Range. Based on estimates provided by Mr. Rupert, the Bigley Objectors have posited that class damages could exceed $63 million.  ECF No. 180 at 17-22; ECF No. 180-1.  In a supplemental affidavit dated September 13, 2019, Mr. Rupert purported to estimate class damages on the basis of three distinct categories.  First, with respect to the shortfall resulting from Range's failure to calculate shale gas royalties on an MCF basis since 2011, Mr. Rupert estimated that class damages total $21,699,223.  The second category of damages is predicated on Mr. Rupert's claim that Range did not apply the cap at all between July 2017 and July 2018; as to this shortfall, Mr. Rupert estimated the class's damages to be $36,285,494.  Finally, Mr. Rupert asserted that Range over-deducted gathering and transporting costs for NGLs during the month of March 2018.  As to this shortfall, Mr. Rupert estimated that class damages total $5,496,528. *See* ECF No. 180 at 17-22; ECF No. 180-1.

Range previously moved to strike Mr. Rupert's affidavit, arguing (among other things) that Mr. Rupert's methodology for calculating damages is fatally flawed.  ECF No. 184.  The Court denied the motion as procedurally improper because there was no legal basis for striking the affidavit from the record.  However, the Court also found that Mr. Rupert's damage estimates -- which were extrapolated from a single client's royalty statement -- were too speculative to be

accepted as relevant fact or opinion evidence.  See ECF Nos. 210, 211.  Therefore, the Court indicated that it would disregard Mr. Rupert's conclusions as to the range of potential class damages in connection with its assessment of the Supplemental Settlement.  *Id.*

Having done so, the Court finds that the $12 million settlement fund is reasonable compensation for the class based on the best possible recovery and the attendant risks of litigation.  The proposed settlement provides the class members prospective relief on the MCF/MMBTU claim and compensates them for most, if not all, of their primary source of damages.  On balance, the Court's *Girsh* analysis counsels in favor of approving the Supplemental Settlement.

### *"Prudential"* and *"Baby Powder"* Factors

Like the *Girsh* factors, most of the *Prudential* factors that are relevant in this case have already been addressed in connection with the Court's discussion of the factors codified in Rule 23(e)(2)(A)-(D).  The Court has previously touched on, *e.g.*, the "maturity of the underlying substantive issues, as measured by . . . the extent of discovery and other factors that bear on the ability to assess the probable outcome of a trial," "whether any provisions for attorneys' fees are reasonable," and "whether the procedure for processing individual claims under the settlement is fair and reasonable."  *In re Prudential Ins. Co. Am. sales Practice Litig.*, 148 F.3d at 323.  For the reasons discussed, these considerations support the fairness and adequacy of the settlement, once adjustments are made to Class Counsel's fee award to maximize the class's recovery.

*Baby Products Antitrust Litigation* instructs courts to consider "the degree of direct benefit provided to the class" from the proposed settlement in light of the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process

used to determine individual awards."  708 F.3d at 174.  These considerations have also been touched on in the Court's prior analysis.  In this case, thousands of class members will receive *pro rata* payments from the settlement fund based upon the volume of the shale gas production that was attributable to their respective royalty interest from March 2011 through the "Final Disposition Date" of the settlement.  ECF No. 135-1, ¶2(a)(iii).  The payments will be automatically calculated and mailed by Range, without any further action required on the part of the class members.  The direct benefit to the class will be both substantial and equitable.

One *Prudential* factor that has not yet been addressed is the class members' inability to opt out of the proposed settlement.  Under the terms of the Supplemental Settlement, no opportunity exists for class members to opt out, nor was such an option discussed in the class notice.  Pursuant to Rule 23(e)(4), "[i]f the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so."

As part of the post-fairness hearing briefing, the Court asked the parties to address this issue.  Not surprisingly, the objectors posit that the Court should allow them to opt out of the proposed settlement, while Range and Class Counsel argue that an opt out is inappropriate under the circumstances of this case.

Because the Court cannot alter the terms of the Supplemental Settlement Agreement, it cannot grant the objectors' request for a direct opt out.  Instead, the Court's authority is limited to either accepting the settlement as is or rejecting it outright due to the lack of an opt-out provision.

Having fully considered the arguments of Class Counsel, the objectors, and Range Resources, the Court will not reject the Supplemental Settlement based upon the fact that it fails to accord class members an opportunity to opt out of the settlement. If the Court were to reject the present settlement, it is possible that Range would not agree to an alternative settlement that includes an opt out provision; but even if Range did, it seems unlikely that a substantial percentage of class members would exercise their right to opt out, given that less than one percent of the class has registered an objection to the existing settlement terms. Meanwhile, any ensuing class notification and opt-out proceedings would further delay Range's payment of compensation to the thousands of class members who are apparently satisfied with the settlement terms as they presently exist. Ultimately, the Court is unwilling to further delay compensation for the majority of class members who are satisfied with the Supplemental Settlement in order to accommodate the preferences of a small minority of objectors.

Nor does this result violate the requirement of due process. In this case, the objectors had an opportunity to opt out of the class before the Original Settlement was approved. According to Range, the Aten and Bigley Objectors collectively realized a benefit of more than $1.7 million from the Original Settlement, and they stand to benefit prospectively in excess of $170,000. *See* ECF No. 167-1, ¶¶11-12. The objectors having accepted the benefits of being in the class -- including the caps that have been applied to date on PPC -- due process does not demand they now be afforded a second opportunity to opt out of the Supplemental Settlement Agreement. No persuasive authority has been presented to the Court that holds otherwise.

### Other Suggested Alternatives

The Aten Objectors have posited that the Court should consider alternative remedies in lieu of approving the Supplemental Settlement. Two of these proposed alternatives -- voiding

the release clause in the Supplemental Settlement Agreement and/or allowing objectors to opt out of the settlement -- have already been discussed and rejected.  The Aten Objectors' third suggestion is that the Court should certify a new class.  The Court declines to do so, as it perceives no jurisdictional necessity for recertification, and it is not clear that the class as a whole (however defined) would benefit appreciably from such measures.  Having been presented with no persuasive authority in support of the Aten Objectors' request, the Court declines to certify a new settlement class.

F.  Conclusion

Based upon all of the foregoing considerations, the Court finds by a preponderance of evidence that the Supplemental Settlement is fair, adequate, and reasonable.  Accordingly, the Court will approve the Supplemental Settlement.


IV.  **Class Counsel's Application for Supplemental Attorney Fees**

The Court next turns to Mr. Altomare's request for an award of attorneys' fees, amounting to twenty percent (20%) of the value of the combined retroactive and prospective payments to the class.  With respect to retroactive relief, Mr. Altomare requests payment in the amount of $2,400,000 (representing 20% of the $12 million settlement fund).

Prospectively, the Class can expect to benefit from increased future royalties. Mr. Altomare asks that the Court award him twenty percent (20%) of these future benefits "as and when they monthly accrue," although he states that he is "willing to limit his request" to a ten-year period. ECF No. 143 at 16, 22.  Practically speaking, this would entail Mr. Altomare receiving a .003 Division of Interest in the class members' future royalty interests.  Since Range Resources has estimated that the future increase in royalty payments to the Class will average

approximately $1,331,135.00 annually over the next five years, Mr. Altomare infers that the Class would reap an aggregate increase in royalties of approximately $13,311,352.00 over the next ten years.  Mr. Altomare's total requested fee award thus approximates $5,062,270.00, calculated as follows:

| Supplemental Settlement | Common Fund | Fee @ 20% |
|---|---|---|
| Retroactive Payment | $12,000,000 | $2,400,000 |
| Future Increase (Limited to 10 Yrs.) | $13,311,352 | $2,662,270 |
| **Sub-Totals** | **$25,311,352** | **$5,062,270** |

See ECF No. 143 at 20.

The Aten Objectors strongly object to Class Counsel's fee request on the grounds that it unfairly dilutes the Class's recovery and is not commensurate with either Mr. Altomare's performance as Class Counsel or the results he has achieved for the Class. The Bigley Objectors lodge similar objections and argue that Mr. Altomare should be awarded no fee at all.

Range Resources has asserted more limited objections which relate solely to Mr. Altomare's request for a percentage of prospective royalty payments.  On that point, Range offers three bases for opposing the prospective attorney fee component:  first, that such an award is inconsistent with the terms of the Supplemental Settlement; second, that inclusion of a "Future Benefits" fee imposes an extensive burden on Range that it has not agreed to undertake; and, third, that the Motion to Enforce only implemented the terms of the Original Settlement Agreement, for which Mr. Altomare has already been compensated. [13]

---

[13] Range originally objected on the additional ground that Mr. Altomare's proposed "division order" improperly covered the entire class, even though the relief sought in the Motion to Enforce related solely to class members who receive royalties from shale wells.  Range correctly pointed out that such a proposal would reduce future royalties to class members who are not part of the Supplemental Settlement and who therefore receive no benefit from it.  *See* ECF No. 145

Federal courts utilize two methods for calculating attorney fee awards:  the lodestar approach and the percentage-of-recovery approach.  *See S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 773 (3d Cir. 2019) (citing *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir. 2001)).  As a general matter, the percentage-of-recovery approach is favored in common fund cases.  *Id.* "[T]his method 'is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure.'" *Id.* (quoting *Cendant*, 243 F.3d at 732).

When determining a fee award under the percentage-of-recovery method, courts consider seven factors, commonly referred to as the "Gunter factors," *to wit*:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000); *see also S.S. Body Armor*, 927 F.3d at 773; *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005). When relevant, courts may also consider such factors as:  the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and any "innovative" terms of settlement. *See In re AT & T Corp.*, 455 F.3d 160, 165 (3 Cir. 2006); *In re Prudential*, 148 F.3d at 338-40. These factors should not be applied in a

_____

at 2, 10.  Acknowledging this error, Mr. Altomare has since submitted a revised "division order" which would apply only to class members who receive royalties from shale wells. *See* ECF No. 171 at 4, ECF No. 171-1 and ECF No. 171-2.  The Court's discussion is therefore limited to Range's other objections.

"formulaic way" because each case is unique, "and in certain cases, one factor may outweigh the rest." *In re AT & T Corp.*, 455 F.3d at 166 (citations omitted).

After determining the appropriate percentage-of-recovery to be awarded, courts typically perform a lodestar cross-check. *S.S. Body Armor*, 927 F.3d at 773 (noting that a cross-check using the lodestar method is "appropriate") (citing *Rite Aid*, 396 F.3d at 305). The lodestar approach entails multiplying the number of hours that the lawyer reasonably spent working on the client's case by a reasonable hourly billing rate for such services in light of the relevant geographical area, the nature of the services provided, and the experience of the lawyer. *Id.* (quoting *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)) (alteration in the original).

In this highly unusual case, the Court's application of the foregoing principles does not support the fee award that Class Counsel is requesting. Accordingly, the Court finds that Class Counsel's fee application must be rejected in substantial measure.

### A.

We first consider the *Gunter* factors as they related to Mr. Altomare's request for retroactive compensation. Here, the size of the settlement fund is $12 million and, as noted, Mr. Altomare seeks an award in the amount of $2.4 million, equal to 20 percent of the fund. Ultimately, the net settlement proceeds will provide a *pro rata* benefit to thousands of class members associated with shale gas wells who have allegedly been shorted in their royalty payments. Prospectively, the Amended Order Amending Leases will potentially benefit any class member who may come to hold an interest in a shale gas well. [14]

---

[14] As explained by Range, class members who hold leases associated with conventional oil and gas wells, and class members who hold leases but do not yet have wells developed, may benefit in the future from the fact that the Amended Order Amending Leases now requires wet and dry

The present phase of the litigation formally commenced in January 2018, when the Motion to Enforce was filed, and terminated in January 2019 when the present settlement terms were reached. During this time, Mr. Altomare claims to have spent 1,133.75 hours prosecuting the class's claims and negotiating the class settlement. The issues litigated in this phase of the litigation were complex, and the settlement was achieved only after Range disclosed a voluminous amount of electronic accounting data, counsel engaged in extensive back-and-forth discussions involving the class claims and the various accounting methodologies, and the parties engaged in arms' length mediation. In the current phase of litigation -- that is, between January 2018 and January 2019, Class Counsel displayed sufficient skill and efficiency to adequately represent the class and to achieve a fair and reasonable settlement, the "crux" of which was recovery of shale gas royalty underpayments that had resulted from Range's use of the MMBTU multiplier. Only a small percentage of class members have objected, albeit passionately, to the settlement and the fee request. Although Mr. Altomare initially negotiated a 33 and 1/3 contingency fee with the Plaintiffs who later became the named class representatives, he is asking for a smaller percentage (20 %) of the class recovery from the Supplemental Settlement. As Judge McLaughlin noted during the 2011 settlement proceedings, a 20 percent fee is generally in line with the percentage-of-recovery that courts have frequently awarded in cases involving settlement funds of similar size. *See* ECF No. 83 at 20 (citing *In re Vicuron Pharmaceuticals, Inc. Securities Litig.*, 2007 WL 1575003 (E.D. Pa. May 31, 2007) (approving counsel fees equal to 25% of the $12.75 million settlement); *Lenahan v. Sears, Roebuck and Co.*, 2006 WL 2085282 (D.N.J. 2006) (fees award equaled 30% of $15 million fund), *aff'd*, 2008 WL 466471 (3d Cir. 2008); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (fees award

---

gas from shale wells to conform to the MCF measurement contemplated in the Original Settlement Agreement. ECF No.198 at 7-10.

equaled 22.5% of $44.5 million settlement fund); *In re Medical X-Ray Film Antitrust Litig.,* 1998 WL 661515 (awarding fees that comprised 33.33% of the $39.36 million settlement); *Lazy Oil* [*Co. v. Wotco Corp.*], 95 F. Supp. 2d [290] at 342-43 (W.D. Pa.1997) (awarding attorneys' fees in the amount of 28% of the $18.9 million settlement fund)).  Were this a garden-variety common fund settlement, the foregoing considerations would likely counsel in favor of granting the requested $2.4 million fee.

        This, however, is not a typical or garden-variety common fund case.  In assessing the appropriateness of the fee award in this class action, the Court cannot lose sight of the fact that this litigation concerns enforcement of a settlement that was entered into more than a decade ago. The relief that Mr. Altomare has obtained for the class achieves no more than placing class members in approximately the position they should have enjoyed by virtue of the original settlement terms. And most saliently, Class Counsel's failure to act on the MCF/MMBTU issue in a more timely and diligent manner significantly disadvantaged the class by delaying resolution of the parties' underlying accounting dispute, thereby compounding the amount of the class members' potential damages.  Consequently, while Mr. Altomare obtained a substantial recovery for the class, his conduct prior to January 2018 resulted in this phase of the litigation being significantly more complicated and risky for the class.  Arguably, Mr. Altomare should have been aware of the discrepancy in the Order Amending Leases when it was filed on March 17, 2011, as that issue had previously been raised at the fairness hearing.  Had Mr. Altomare promptly sought relief from the Court after entry of the Order Amending Leases -- or even in July 2013 when he was first actually aware of the discrepancy in that Order, resolution of the MCF/MMBTU issue would have likely been a far more straightforward process, especially because Judge McLaughlin was still the presiding district judge at that time.  In short, any risk of

nonpayment related to the MCF/MMBTU issue was largely exacerbated by Class Counsel himself.

Moreover, even if Mr. Altomare had obtained relief for the class in a timely fashion, thereby preserving the class members' rights under the Original Settlement Agreement, it would still be debatable whether any additional compensation would be warranted.  As part of the 2011 settlement, Mr. Altomare was paid a percentage of the settlement fund (i.e., 25 percent of 1.75 million, or $437,500), plus a percentage of the class members' royalties over the ensuing five-year period.  The amount of the payments that Mr. Altomare actually received over that five-year period has not been disclosed as far as this Court is aware, but it was valued at $4,212,882, as of the time that Judge McLaughlin approved the initial fee award.   ECF No. 83 at 12-13.  Thus, the total estimated value of Mr. Altomare's initial attorney fee award in 2011 was $4,650,382.  Id. at 12-13.  In support of the 2011 fee award, Mr. Altomare represented that he had spent some 2,000 hours litigating the class claims; he also estimated that he would spend another 1,225 hours over the ensuing four years responding to class member inquiries and attending to other administrative matters related to the 2011 settlement.  See ECF No. 83 at 19-20.  Utilizing an hourly billing rate of $250 and applying a multiplier of 5.95, Mr. Altomare represented that the appropriate lodestar figure was $4,650,382, commensurate with the estimated value of his proposed 20% fee request.  Id. at 21.  In assessing the 2011 fee request, the Court acknowledged that it was "impossible . . . to establish the appropriate multiplier . . . with absolute certainty" because no one could know for sure how many hours Mr. Altomare would have to expend in the future working on the case, nor how much he would earn in future fees from the class members' respective gas royalties. Nevertheless, the Court granted Mr. Altomare's fee arrangement contemporaneously with its approval of the Original Settlement Agreement.  ECF No. 83.  In

short, Mr. Altomare was handsomely rewarded in 2011 for his past -- and anticipated future -- efforts on behalf of the class.

Generally, the percentage-of-recovery method is favored in Common Fund cases because it "allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 300 (internal quotation marks and citation omitted). Here, both Range and Class Counsel acknowledge that the MCF/MMBTU shortfall was the class's primary claim in this phase of the litigation. The record reflects that Class Counsel's success in securing a $12 million fund was mainly attributable to his prosecution of that claim. Mr. Altomare also successfully litigated the FCI claim to the extent that the class obtained prospective relief on these expenses. On that point, the record shows that Range changed its accounting practices and has been including FCI expenses in the PPC Cap since approximately July of 2018. Hrg. Tr. at 131; ECF No. 184-1, ¶11. The remainder of Class Counsel's efforts were spent investigating claims that Mr. Altomare ultimately found to be meritless, unactionable, or otherwise not worth pursuing when weighed against the prospect of a substantial settlement.

In sum, Class Counsel's success at this juncture involves gains that the class bargained for in 2011 and should have received on a continuous basis from March 2011 through the present. It is difficult to know how the Court would have ruled if Mr. Altomare had litigated the MMBTU claim in 2013, when Mr. Altomare was first made aware of the issue; however, it is conceivable that the class would have obtained no less of a recovery than it is presently receiving. Therefore the size of the $12 million settlement fund should not obscure the fact that the class has not achieved any clear net "win" in this case. Accordingly, the Court concurs with

the objectors' position that Mr. Altomare's requested fee is not commensurate with the benefits achieved through the settlement and, if approved, would unfairly dilute the class's recovery.

At the same time, the Court recognizes that Mr. Altomare put considerable effort into litigating the MMBTU issue and negotiating the settlement.  His knowledge and experience no doubt contributed to the successful resolution of the class's claims.  The Court also recognizes that class members were themselves on constructive notice of the MMBTU issue, in that the March 17, 2011 Order Amending Leases was a matter of public record and Range's computation of shale gas royalties based on MMBTUs was disclosed on its monthly royalty statements. Finally, the Court must account for the fact that Mr. Altomare timely litigated the FCI claim and achieved a prospective benefit for the class in terms of effectuating a prospective change in Range's accounting practices.

On balance, this Court concludes that that the fairest course of action is to provide Class Counsel some compensation, but at a deep discount. Accordingly, the Court will award Mr. Altomare a fee in the amount of $360,000 which constitutes 3 percent of the settlement fund, leaving $11,640,000 to be disbursed among the class members on a *pro rat*a basis, as contemplated in the Supplemental Settlement Agreement.

## B.

For many of these same reasons, the Court concludes that Class Counsel's request for a prospective fee award based on a percentage of class members' future royalty payments is inappropriate and must be denied.  To the extent that Mr. Altomare achieved a pecuniary benefit for class members in perpetuity through an increase in their future royalty payments, that is a result that was contemplated by the Original Settlement Agreement, for which Mr. Altomare previously received generous compensation.

The Court also notes that the requested prospective fee award is contrary to the terms of the Supplemental Settlement Agreement.  Paragraph 2 of the Supplemental Settlement Agreement states that "Range will pay to the Class Twelve Million Dollars ($12,000,000.00) ('the Gross Settlement Amount'), less any amount awarded as costs and fees to Class Counsel (the 'Net Settlement Amount')," in accordance with a designated time table.  See ECF No. 135-1 at 3, ¶2.  Paragraph 3 specifies that, "[w]ithin fifteen (15) days following the Final Disposition Date[15], Range will pay directly to Class Counsel all costs and attorney's fees as may be approved by the Court.  Any such award of costs and fees paid by Range shall be credited against and deducted from the Gross Settlement Amount in accordance with Paragraph 2(a)."  Id. at 5, ¶3.  Taken together, these provisions clearly contemplate a single, one-time payment by Range to Mr. Altomare for all fees and expenses, which are to be deducted from the $12 million settlement fund following entry of the Final Approval of the Supplemental Settlement Agreement.  The Supplemental Settlement Agreement also contains an integration clause, which merges all prior negotiations and agreements between the parties.  See id. at 6, ¶9.  Thus, as Range persuasively argues, no future or ongoing payments to Class Counsel are contemplated under the terms of the agreement.  "A district court is not a party to the settlement, nor may it modify the terms of a voluntary agreement between the parties."  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010); *see also Evans v. Jeff D*., 475 U.S. 717, 726-27 (1986) ("[T]he power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed.").

---

[15] "Final Disposition Date" is defined as either the date of the Final Order of Court or, if there is an objection and appeal, the date of any resolution of an appeal affirming this Court's Final Order.  See ECF No. 135-1 at 4, ¶2(a)(ii).

The Court also credits Range's assertion that the "division order" contemplated by Mr. Altomare would impose a substantial administrative burden on Range which it did not agree to assume.  Relevantly, Range has submitted an affidavit from Ms. Whitten, dated July 25, 2019, wherein Ms. Whitten explains this additional burden, as follows:

[ ] Every well has a division of interest schedule (DOI) listing all owners in each well and their proportionate share of the revenues and deductions attributable to the well. Range would have to identify every DOI schedule for every well for every class owner.

[ ] The DOI schedule would need to be manipulated to deduct the percentage from each landowner and add a line of detail for class counsel with the combined interest at the well level.

[ ] Range would have to create a new DOI schedule for every well with a new effective date (date determined by approval of this request) and load the files into Range's system. I estimate this would require Range to create nearly 6,000 new DOI schedules.

[ ] I estimate this task would require 4-6 employees working for more than two weeks, approximately 320 to 480 man hours, to identify, download, adjust and implement the new data files. As Range lacks the staff to dedicate employees to a short-term project of this magnitude, it would have to hire outside contractors, who will charge significant fees, to accomplish these changes.

[ ] At the conclusion of ten years. Range would then have to undertake a similar process to restore the original royalty interests of all class members.

[ ] Because the fee proposal would entail diverting royalties from the class members to class counsel, an instrument reflecting that arrangement would need to be filed in the public record in each county where the class leases are located, indexed to each class lease, to provide notice to any person running title that a percentage of the royalties under the class leases in that county have been transferred for a ten year period. The preparation and recording of this document will require additional time and expense, including the payment of recording fees of every county where a class is located.

[ ] In addition, I expect that Range will incur additional time and expense addressing concerns or questions raised by royalty owners and/or class counsel regarding the transfer of the interests, and calculation of royalties after any such transfer is accomplished.

[ ] Class counsel's proposal to divert a portion of all class members5 future royalties therefore imposes a significant burden on Range, both in terms of time and money.

ECF No. 145-1, ¶¶9-13.

At the fairness hearing, Mr. Altomare cross-examined Ms. Whitten concerning these assertions.  Mr. Altomare attempted to demonstrate that the administrative burden described by

Ms. Whitten was exaggerated and that the requested award of a percentage of future royalties could be implemented fairly easily with the assistance of IT professionals. The Court finds, however, that Mr. Altomare's presentation did not credibly rebut Ms. Whitten's assertions concerning the administrative costs that Range would incur if the proposed division order were approved and entered by this Court.

Finally, the Court has concerns that the notice to the class did not sufficiently apprise them of Mr. Altomare's request concerning future fees. The notice states that, apart from his request for 20 percent of the $12 million fund, "Class Counsel will additionally request a fee relating to the future benefits to the class." ECF No. 141-1 at 2. But nowhere does the notice apprise class members that a portion -- much less 20 percent -- of their future royalties over a ten year period would be diverted to Class Counsel. And, of course, class members would have found no such information in the Supplemental Settlement Agreement itself had they followed the link in the notice to the actual agreement.

For all of the foregoing reasons, the Court concludes that an award of prospective attorney's fees calculated as a percentage of future royalties is inappropriate. Class Counsel's request for such fees will therefore be denied.

C.

As discussed, a court awarding a percentage-of-recovery fee should normally perform a cross-check using the lodestar method. *S.S. Body Armor*, 927 F.3d at 773; *see Rite Aid*, 396 F.3d at 305. This lodestar cross-check need not entail either "mathematical precision" or "bean-counting." *Id*. (citing *Rite Aid*, 396 F.3d at 306). A certain amount of imprecision is therefore permitted.

In this case, however, a meaningful lodestar cross-check is all but impossible for at least two reasons.  First, the value of the increased royalties that class members will receive in perpetuity is inherently imprecise due to factors such as the unknown productive life of the wells in question and the vagaries of market fluctuations.  Second, Mr. Altomare did not maintain contemporaneous billing records for his consultations with Mr. Rupert, and his reconstructed billing records are ultimately too inaccurate to serve as a reliable account of his time in that regard.

Mr. Altomare has nevertheless proffered a cross-check computation pursuant to which 2,721.25 work hours are multiplied by an hourly rate of $475, yielding a lodestar of $1,292.593.75.  ECF No. 143 at 20.  Mr. Altomare suggests that the Court apply a multiplier of 3.92 to this figure, yielding a total cross-check fee of $5,062,270, which equates to the estimated value of his total fee request.

The Court declines to adopt this computation.  First, the Court does not agree that 2,721.25 work hours should be utilized in a lodestar cross-check.  As noted, Mr. Altomare states that he has expended some 1,133.75 hours prosecuting the claims in the Motion to Enforce and the Class's Rule 60(a) motion and negotiating the Supplemental Settlement Agreement.  ECF No. 143 at 9, 20.  He arrives at the 2,721.25 figure by adding in one half of the hours he originally spent litigating the class claims.  ECF No. 143 at 20.  Based on his representation that he has expended 4,258.75 total work hours since the inception of this case in 2008, Mr. Altomare posits that his current fee award based on 2,721.25 of work hours, represents a "voluntar[y] and considerabl[e] reduc[tion]" of his hours.  ECF No. 171 at 11.  This line of argument is not persuasive in that Mr. Altomare's work hours culminating in the 2011 settlement were already

factored into his 2011 fee award.  The Court is not persuaded that additional compensation for those hours is appropriate at this juncture. [16]

Second, the Court is not persuaded that a multiplier of 3.92 is appropriate in this case. The U.S. Court of Appeals for the Third Circuit has noted that, in common fund cases where attorneys' fees are calculated using the lodestar method, "[m]ultiples ranging from one to four" are the norm.  *S.S. Body Armor*, 927 F.3d at 774–75 (citing *Prudential*, 148 F.3d at 341 and *Cendant*, 243 F.3d at 737–42 & n.22); *see also In re Rent-Way*, 305 F. Supp. 2d at 517 (collecting cases).  But in view of the fact that Class Counsel's own conduct significantly complicated the calculation of class damages and exacerbated the risk of nonpayment, a significantly reduced multiplier is warranted in this case.  To that end, the Court concludes that a fractional multiplier of .7 is appropriate.  Notably, even if the Court were to credit all of the hours that Mr. Altomare claims to have spent working on the recent phase of this litigation (i.e., 1133.75 hours), and even if the Court were to adopt his requested hourly rate of $475, the resulting lodestar figure would be $538,531.25.  Applying a multiplier of .7 yields a cross-check figure of $376,971, which is generally in line with the percentage-of-recovery that the Court deems appropriate in this case.

For these reasons, Mr. Altomare's Application for Supplemental Attorney Fees will be granted to the extent that he will be awarded $360,000 from the common settlement fund.  In all other respects, the application will be denied.

---

[16] Mr. Altomare suggests in his filings that he was actually *undercompensated* in 2011 to the extent that he inadvertently utilized a $250 hourly rate, instead of his current hourly rate of $475. *See* ECF No. 143 at 17-19.  The Court perceives no need to address that issue at the present time.

## V.     __Motion to Remove Class Counsel__

Finally, the Court turns to the Bigley Objectors' motion to remove class counsel. ECF No. 179.  These objectors argue that removal is necessary because Mr. Altomare's interests have significantly deviated from those of the class such that he can no longer adequately represent their interests.

"'(O)nce the decision to certify a class has been made, the court remains under a continuing duty to monitor the adequacy of representation to ensure that class counsel provides zealous, competent representation through the proceedings and to address conflicts of interests if they develop.'"  *Wallace v. Powell*, No. 3:09-CV-0291, 2013 WL 2042369, at \*9 (M.D. Pa. May 14, 2013) (quoting *In re Integra Realty Resources, Inc*., 262 F.3d 1089, 1112 (10th Cir. 2001); *citing In re Fine Paper Antitrust Litig*., 617 F.2d 22, 27 (3d Cir.1980)).  As the Bigley Objectors observe, class counsel should generally be removed only in exceptional circumstances.  *See In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 179, 186-87 (2d Cir. 1987).  The U.S. Court of Appeals for the Third Circuit has adopted a "balancing approach" to analyzing motions for disqualification of class counsel based on alleged conflicts of interest.  *Lazy Oil Co. v. Witco Corp*., 166 F.3d 581, 589 (3d Cir.1999) (endorsing the balancing approach employed by Judge Adams in concurrence in *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 162 (3d Cir.1984)).  Under that approach, "in the class action context, once some class representatives object to a settlement negotiated on their behalf, class counsel may continue to represent the remaining class representatives and the class, as long as the interest of the class in continued representation by experienced counsel is not outweighed by the actual prejudice to the objectors of being opposed by their former counsel." 166 F.3d at 590.

Here, the Bigley Objectors' motion is predicated on their allegations that Mr. Altomare: (i) was negligent when he failed to pursue the MCF/MMBTU issue in 2013, (ii) conducted insufficient discovery on behalf of the class, resulting in an insufficient settlement, and (iii) committed fraud upon the Court in connection with his billing records.  All of these allegations have been considered and addressed in connection with the Court's assessment of the proposed Supplemental Settlement and Class Counsel's supplemental fee petition.  Both the proposed settlement and the supplemental fee petition have been subjected to heightened scrutiny in light of the objectors' allegations.  For the reasons discussed herein, the Court has found it appropriate to greatly reduce Mr. Altomare's fee award commensurate with the overall benefit achieved for the class and the unique circumstances of this case.  The Court has also determined that the net proceeds available to the class provide a fair, appropriate, and reasonable settlement of their claims.

Based upon the considerations discussed herein, the Court declines to remove Mr. Altomare as Class Counsel at this point in time.  But because the objectors' arguments for removal are intertwined with their challenges to the proposed settlement and the fee request, and because these matters will likely be definitively addressed on appeal, the Court will deny the Bigley Objectors' motion to remove counsel without prejudice to be reasserted at a later point in time, should future developments in this case warrant a revisiting of that issue.

## VI.   Conclusion

For the reasons that follow, the Joint Motion for Approval of Supplemental Agreement and Stipulation of Settlement will be granted.  Class Counsel's Application for Supplemental

Attorney Fees will be granted in part and denied in part.  The "Bigley Objectors" Motion to Remove Class Counsel will be denied without prejudice.[17]

*Susan Paradise Baxter*

SUSAN PARADISE BAXTER
United States District Judge

---

[17] At the fairness hearing, this Court indicated that it would determine the status of the objectors for purposes of taking an appeal.  Hrg. Tr. at 129.  Upon consideration of that issue, the Court concludes that the objectors have standing to appeal this decision and need not move to formally intervene in this action in order to preserve their appellate rights. *See Devlin v. Scardelletti*, 536 U.S. 1, 7- 14 (2002); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 573 (9th Cir. 2004).